MASANO, ET AL. *v.* ALBRITTON

[No. 108, September Term, 1966.]

424

*Decided February 10, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ., and MURPHY, J., Chief Judge of the Court of Special Appeals, specially assigned.

*Thomas B. Yewell* for appellants.

*Kenneth E. Pruden,* with whom were *George T. Burroughs* and *C. Maurice Weidemeyer* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

Zelner Albritton (Albritton), the appellee and plaintiff below, sued the appellants, Thomas C. Masano (Thomas), John T. Masano (John), Masano, Inc. and C. & H. Enterprises, Inc. to recover damages for breach of a written agreement under seal, dated February 14, 1956. The jury rendered a verdict for the plaintiff Albritton for $7,500 and from a judgment entered for this amount and costs, the appellants filed a timely appeal to this Court.

Albritton is an ornamental sculptor and designer, recognized as a well qualified designer and model maker. He at one time had charge of all production and was the model maker and designer of a firm named Bordezi, a leading company in the field of making art objects. The Masanos, sometime prior to February 4, 1956, were engaged in making lamps, but their operation was unsuccessful because their casts were poor and they were not putting a correct finish on their products. Albritton made some models which were inspected by the Masanos, and Albritton agreed to teach the Masanos his skills, Albritton had his attorney in Annapolis prepare a written agreement which was executed by Albritton, Thomas and John on February 14, 1956.

Paragraph 1 of the agreement provided that the Masanos were to manufacture and sell lamps designed by Albritton. Paragraph 2 provided that Albritton would teach the Masanos and their employees his "manufacturing processes to manufacture lamps" and supply the Masanos with all of the existing models and from time to time with new lamp models, which the parties might agree were necessary to better business.

Paragraph 3 provided that Albritton would teach the Masanos and their employees "his processes and methods for the manufacture of lamps." For this instruction, Albritton would be compensated by the Masanos at the rate of $100 a week for a forty-hour week, payable while Albritton was engaged in the instruction of "his processes and methods to manufacture lamps."

Paragraph 4 provided that after the Masanos had commenced manufacturing, Albritton would receive from them "10 per cent of the gross wholesale price of all goods sold" by the Masanos "coming under the purview of this agreement. The said gross wholesale price shall be one-half of the gross retail price, and shall include anything made of composition, such as wax, plaster, plaster of Paris, or any other castable;" and that Albritton receive from the Masanos "10 per cent of the gross wholesale price of any and all of the composition line" which the Masanos "should manufacture." Paragraph 4 further provided that Albritton "shall have exclusive designing rights as to all items in the composition line; and that all the designs remain the property" of Albritton and "all manufacturing rights are re-

served" to him except as stated in the contract; "that the said 10 per cent commission hereinbefore mentioned shall be paid" to Albritton by the Masanos "on the 1st of each and every month on all merchandise shipped for the prior month" by them.

Paragraphs 5 and 6 provided that all lamps should have the designation "Designed by Albritton Studios, Annapolis Maryland; and produced by Thomas Masano and Brother" and that the Masanos should have exclusive rights to all designs of lamps made by Albritton according to the terms of the contract.

Paragraph 7 provided that in the event of Albritton's death, his estate should be paid by the Masanos "10 per cent of the gross wholesale price of the designs being manufactured" at the time of his death "as long as such designs or any part thereof are manufactured by" the Masanos. "The gross wholesale price shall be one-half of the gross retail price."

Paragraph 8 provided that the "sales records as to the composition line covered in this agreement" of the Masanos should be open for the inspection of Albritton and his agent or agents "at all times."

In Paragraph 9, the Masanos agreed not to divulge any of the manufacturing and finishing methods of Albritton to anyone without Albritton's "express, written consent," and that the agreement should be "binding on anybody buying the business of Thomas Masano and Brother, manufacturing the composition line covered by this contract; or anyone manufacturing a composition line in which Thomas Masano or his brother, or their successors, are connected in any way."

The parties also agreed that they waived any rights covered by the Statute of Limitation and agreed that "they will work together and cooperate to do the best they can for the advancement of the provisions contained herein."

Then followed the signatures of Albritton, Thomas and John and a notarial acknowledgment that the agreement was their act.

On the back of the first page of the agreement introduced into evidence is a notation in ink as follows:

"Referring Article 3. Said salary of $100 Dollars per 40 hr. week is agreed to be paid after lamps have

been placed on Market for sale; at this time 5% is to be deducted by the party of the second Part [the Masanos] from the sale of the lamps to be paid to the party of the first part [Albritton] in addition to the 10% until such indebtedness is paid to the party of the first part by the Party of the second Part at which time we will revert to the agreement of original 10%." Then follows three signatures: "Zelner Albritton, J. T. Masano and T. C. Masano."

Immediately below the portion written in ink is the following notation in pencil: "Amount Due in time $2000.00 to Zelner Albritton" followed a signature in pencil "J. T. Masano."

Albritton testified that he spent the entire winter and the greater part of the spring of 1956 in making models especially for the Masanos. He then taught them how to apply the finishes and leaf correctly and how to paint the right colors, tone them and antique them as well as how to underglaze and mix colors. He taught them to make proper casts, eliminate air bubbles from them and to prevent harsh lines from forming on the casts. Albritton stated his compensation for this instruction, at the rates agreed upon, amounted to $2000, no part of which had been paid to him. He further stated that after samples were made, he took the Masanos to New York City to an agent, Mary Ryan, who told the Masanos that if they would manufacture the same finish and quality of the samples she could do business of $100,000 a year to start. Mary Ryan sent the Masanos some orders but became disgruntled because the manufactured lamps failed to measure up to the samples. She finally returned the samples to the Masanos who thereafter obtained another agent. During this period the gross amount of lamps sold was $242.36, and Albritton received $24.24. Albritton, however, received nothing from any business done by the Masanos with their subsequent agent and when he saw the Masanos about this, was informed that they were going out of business. The Masanos retained the models made by Albritton and the molds made by using those models.

Albritton further testified that without his knowledge, Thomas engaged in the business of manufacturing composition line art objects by casting and finishing them. Shortly prior to filing suit

on September 13, 1963, Albritton was informed that the Masanos had a shop at Brandywine. Visiting this shop, Albritton observed that the successors to the Masanos [1] had some or all of the art objects cast from molds made from models prepared by Albritton, and that these art objects were in the process of being finished. The manufacturers had employed a caster and had "rehashed" some of Albritton's art objects by taking a part of one and combining it with another. All of the work being done was composition work.

Albritton testified without objection that the agreement was intended not only to cover lamps but "other castable lines" and he urged the Masanos to go forward with another line of wall brackets and panels, but they were not interested at the time. He further testified that the agreement covered anything in a castable material which is manufactured and that "anything they manufactured in the line of composition cast, wall brackets, or anything else, would come under the contract, because they use the same finishing processes." He further stated:

"They [the Masanos] were mainly interested in lamps; but the other was put in there because we had discussed that later on. We had put the other things in, like wall brackets and panels. That certainly covers anything made of castable material, using the same process, of plaster, wax or any castable material. That would even cover it if they made them out of lead."

Thomas, on the other hand, testified that he understood that the agreement applied only to lamps manufactured by the Masanos. These lamps sold at retail prices ranging from $37.50 to $400. He testified that the designs of his molds came from Albritton's models. He never accounted to Albritton for monthly sales after 1956 because he understood, and Albritton agreed, the agreement had terminated. The molds made from the Albritton models, were retained by Thomas, although he testified

---

1. Thomas testified that at the time of the hearing in the case in the trial court he was engaged in the manufacturing business under the name of C. & H. Enterprises, Inc. (added as a party defendant by amendment) and prior to C. & H. Enterprises, Inc., he did business as Masano, Inc., and prior to that in his own name.

that when he went into business a year later he did not use those molds, but his own molds. He admitted, however, that he was using some of the molds from Albritton models, when Albritton visited his shop in Brandywine.

The proof of damages most favorable to Albritton indicated that, excluding the $242.36 of business done with Mary Ryan (for which Albritton had received $24.24) the gross wholesale price of goods sold by the Masanos, excluding the receipts for refinishing desks, was $58,078.47. Thomas, testified that certain invoices, extracted from the files, indicated that $903 of this amount was attributable to wiring lamps not manufactured by them and a few wooden lamps. Albritton claims 10% of $58,-078.47 or $5,807 in round figures, less 10% of the wiring receipts or $90, leaving $5,707 as the claim under Paragraph 4 of the agreement, to which was added the $2,000 item under Paragraph 3 of the agreement, making a total claim of $7,707. As we have noted, the jury found a verdict for Albritton for $7,500 somewhat less than the total amount claimed by Albritton.

The Masanos moved at the end of the plaintiff's case and at the end of the entire case for a directed verdict. These motions were based on the theory that the agreement was unambiguous, applying only to lamps manufactured and sold according to the processes taught the Masanos by Albritton, and the proof did not indicate that any such lamps had been manufactured after 1956; and further, that because Albritton did not distinguish, in his damage claim, between lamps and other objects manufactured, he had failed in his proof of damages. The trial court overruled both motions and submitted the issues to the jury on the theory that the agreement was ambiguous and the jury should determine from the facts which version of the applicability of the agreement ("lamps" only vs. "composition line, including wax, plaster, plaster of Paris, or other castable") was intended by the parties. The trial court's charge properly presented these issues, including an instruction that any terms of doubtful construction should be construed most strongly against the party preparing it, and an instruction regarding the damages recoverable. The Masanos did not except to the charge as given.

Before us the Masanos' claim that the trial court erred in failing to grant these motions for a directed verdict in their

favor on the grounds argued below. We believe the trial court properly declined to grant the motions for a directed verdict and affirm the judgment.

### (1)

In Paragraphs 1, 2, 3, 5 and 6 of the agreement of February 14, 1956, the word "lamps" alone is used to describe the scope of those paragraphs, while Paragraphs 4, 7 and 9 of the agreement indicate a broader and more comprehensive coverage. In Paragraph 4, which as we have indicated is the provision in the agreement setting up the basis *for payment* to Albritton, the formula for payment is based on *"anything* made of *composition, such as* wax, plaster, plaster of Paris, *or any* other *castable;"* it later refers to the wholesale price "of *any and all* of the *composition line"* which the Masanos *"should manufacture."* (Emphasis supplied). Paragraph 7, providing for payments after Albritton's death, does *not* limit the payments to proceeds derived from "lamps," but to the "designs being manufactured" by the Masanos at the time of his death. The maintenance of sales records is for "the composition line covered in this agreement." The provision of Paragraph 9, making the agreement binding on the purchasers of the Masanos' business, applies to those "manufacturing the composition line covered in this contract; or anyone manufacturing a composition line in which Thomas Masano, or his brother, or their successors, are connected in any way."

The agreement on its face is consistent with two possible constructions: (1) that although "lamps" were the principal or dominant item considered by the parties, other possible castable items were also in contemplation and if these other objects were manufactured by the Masanos pursuant to the agreement, payment should be made on the basis of the formula set out in Paragraph 4, including the wholesale price of all castable items. This construction is reinforced by the provisions in Paragraphs 7 and 9 which protect Albritton's future payments after his death or if there should be a transfer of the business. (2) "Lamps" alone are mentioned in five paragraphs of the agreement and this indicates an intention that the whole agreement was only concerned with the manufacture of lamps. We cannot say that reasonable men could come to only one conclusion from

the words used in the entire contract. The trial court was justified in submitting to the jury the issues in regard to the intention of the parties in the light of the conflicting facts presenting conflicting theories of construction.

The applicable Maryland law was aptly stated by Chief Judge Brune, for the Court, in *Ebert v. Millers Fire Insurance Co.*, 220 Md. 602, 610, 155 A. 2d 484 (1959) as follows:

> "The record in this case presents no real dispute as to the facts which are pertinent to the question of coverage. That question is one of the construction of the contract in the light of the language employed in the contract, the subject matter and the surrounding circumstances. When these are clear, it is the province of the court, rather than of the jury, to construe the contract. *Sperling v. Terry,* 214 Md. 367, 135 A. 2d 309; *Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 122 A. 2d 563. Where, however, the surrounding circumstances, as shown by the evidence properly admissible or admitted without objection, create a doubt as to the meaning of the contract, the question of the meaning of the contract may be submitted to the jury. *Montauk Corporation v. Seeds,* 215 Md. 491, 138 A. 2d 907, and cases and authorities therein cited, including 3 Williston, *op. cit., supra,* §616." See also 3 *Corbin on Contracts,* sec. 554 (1960).

### (2)

The only question in regard to the damages is whether the evidence afforded the jury a sufficient basis for estimating the amount of damages in money with reasonable certainty. *Restatement of Contracts,* sec. 331, cited with approval in *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 226, 37 A. 2d 305 (1944). See also 5 *Corbin on Contracts,* sec. 1020 (1960).

Although the testimony of Thomas in regard to his records and those of his succeeding companies was somewhat vague and contradictory. the proof most favorable to the plaintiff, Albritton, indicated a basis on which the jury might have found a verdict as high as $7,707. The figures were taken from the books

and records of Thomas and his succeeding companies and showed initially the amount of the business done, admittedly from products using at least a part of the molds made from Albritton's models. The burden of coming forward with evidence to show the jury the portions of the gross business which were not subject to the agreement then passed to Thomas. Cf. *District Heights Apartments v. Noland Co.,* 202 Md. 43, 95 A. 2d 90 (1953). He apparently succeeded in showing that certain items were not covered, but excluding these amounts, the verdict of the jury is less than 10% of the net amount. We conclude that the evidence presented a sufficient basis for the jury on which to estimate the damages with reasonable certainty and the trial court properly submitted the question of damages to the jury.

*Judgment affirmed, the appellants to pay the costs.*