470 A.2d 822

**FIRST NATIONAL BANK OF MARYLAND and Gilbert E. South, Personal Representative of the Estate of Billy F. Rankin**

v.

**BURTON, PARSONS & CO., INC., et al.**

**No. 401, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Feb. 3, 1984.

Certiorari Denied June 7, 1984.

---

438

Thomas J. Shaughnessy, Fairfax, Va., with whom were Dexter S. Odin, Sally Ann Hostetler, Odin, Feldman & Pittleman, P.C., Fairfax, Thomas D. Murphy and Madden & Murphy, Rockville, on the brief, for appellants.

Jeffrey S. Davidson, Washington, D.C., with whom were David K. Perdue, John M. Walker, Kirkland & Ellis, Wash-

ington, D.C., Patrick J. Attridge, John A. King and Mac-Leay, Lynch, Bernhard, Gregg & Attridge, Rockville, on the brief, for appellees.

Argued before GILBERT, C.J., and BISHOP and AL-PERT, JJ.

GILBERT, Chief Judge.

Words, it has been said, are the expression of ideas. Accepting that as true, we wish, in the instant case, that the parties' ideas had been more clearly expressed.

As this appeal reaches us, it involves claims for royalties on patents, allegations of discovery rule violations, *quantum meruit,* an assertion of fraud, a $750,000 verdict against the appellee, and a cross-appeal.

Before we endeavor to unravel the wopse in which the parties placed themselves, we shall describe the factual setting from which this litigation arose.

Dr. Billy F. Rankin was a successful inventor who developed an entire line of ophthalmic and contact lens products. Virtually all of Dr. Rankin's inventions were originated while he was an employee of Burton, Parsons & Co., Inc., a Montgomery County concern owned, for most of the time with which we are concerned, by the Manfuso family. Dr. Rankin was first hired by Burton, Parsons in 1960 at a weekly salary of $100.00. He worked for the company from 1960 until his death in 1981. During that period Burton, Parsons grew from a small manufacturer of two bulk laxatives into an international corporation with domestic and foreign subsidiaries devoted almost exclusively to contact lens and eye care products.

Over the twenty-one years of their association, Dr. Rankin and Burton, Parsons entered into several written agreements. The first of which, dated March 15, 1961, was a contract of employment. It provided in part:

"6. *Inventions, Formulas or Discoveries:*

Employee agrees that any inventions, formulas or discoveries which Employer [sic] may obtain knowledge of through his research and development efforts or otherwise in the course of his employment shall be and become the sole property of Employer. Employee agrees to disclose fully to Employer all particulars including know-how incident to any such invention, formula or discovery and to execute such patent applications, assignments of patent or further assurances as may be required to vest full and perfect title to such inventions, formulas or discoveries in Employer. However, the vesting of title in Employer, as aforesaid, shall not preclude the parties hereto from negotiating a further agreement for payment to Employee of royalties or other compensation for such inventions, formulas or discoveries as may prove capable of commercial development. It is agreed that the amount of such compensation, if any, will be dependent upon factors presently incapable of accurate appraisal, such is [sic] patentability, competitive products, public acceptance, etc., and for that reason no more definite agreement is attempted at this time relative to royalties.

Should employer decline to utilize an invention, formula or discovery of Employee for a period of two years after its full disclosure by Employee and for a period of six months after notification by Employee, then all proprietary rights to such invention, formula or discovery shall revest in Employee and he shall have a full and perfect title to same which he may utilize in promoting the product himself or which he may convey to another prospective purchaser."

Later that year the parties contracted what is now styled as "1961 Royalty Agreement." That contract provided for the payment to Rankin of royalties based on the foreign and domestic net sales of the products known as "Clens," "Soa-Clens," [1] and "Soothe."

---

1. Soa-Clens is spelled in different ways throughout the record. We have adopted the spelling as it appears in the agreements.

Another royalty agreement was negotiated by Dr. Rankin and Burton, Parsons in 1968. It was virtually identical to the 1961 Royalty Agreement in all but a few aspects. The earlier agreement provided for royalty payments during the lives of the products, while the latter accord called for the payments to terminate upon the expiration date of the patents, irrespective of the products' life span. The 1961 Royalty Agreement provided for the payment of royalties on "Soa-Clens" only when the net sales of that product exceeded a floor of $25,000. On the other hand, the 1968 Royalty Agreement eliminated the sales floor. Furthermore, the 1968 Royalty Agreement expressly superseded the 1961 Royalty Agreement.

In addition to payments under the 1961 and 1968 written agreements, Dr. Rankin received royalties on four other creations. Those four inventions were marketed as the Adsorbobase products, and payments were made to Dr. Rankin pursuant to an oral agreement with Burton, Parsons.

It appears from the record that Dr. Rankin received from salary and royalties an annual average income of $100,000 throughout the 1970's. Between 1969 and 1981, seventeen Rankin products generated in excess of 220 million dollars in net sales for Burton, Parsons. Thus, it appears both Rankin and Burton, Parsons prospered, the latter perhaps better than the former.

The Manfuso family sold their Burton, Parsons stock in 1979 to Nestle, S.A., and the Manfusos resigned their positions as company officers. Shortly thereafter, Burton, Parsons was merged into Alcon Laboratories, a Nestle subsidiary. Alcon continued to make royalty payments to Dr. Rankin, who remained an employee following the acquisition and merger. We shall for the purpose of continuity refer to the employer as Burton, Parsons.

Apparently no royalties were paid on several of Rankin's creations that were being marketed by Burton, Parsons, and in 1981 Dr. Rankin requested a commencement of negotiations with respect to royalties. We infer that progress

satisfactory to Rankin was never made on those negotiations, inasmuch as suit was commenced by Rankin in January, 1982. Rankin's declaration alleged breaches of contract occasioned by Burton, Parsons's failure to pay the royalties due to Dr. Rankin. Additional claims were made in *quantum meruit* as well as for fraud, punitive damages, and for declaratory judgments with respect to future royalty payments.

The day after Rankin's suit was filed, he died.[2] His personal representatives, First National Bank of Maryland and Gilbert E. South, were substituted as parties plaintiff. By the time Burton, Parsons & Co., Inc., and Alcon Laboratories, Inc., entered their pleas, the personal representatives were parties of record. Throughout this opinion we shall refer to the personal representatives as Rankin.

After a five day jury trial in the Circuit Court for Montgomery County (Miller, J.), the jury returned a verdict for Rankin in the amount of $750,000, a sum it found to be owed to Dr. Rankin for unpaid royalties. Motions for a judgment *non obstante veredicto* and a new trial were denied. This appeal and cross-appeal ensued.

Rankin has posed six issues to us, and Burton, Parsons has posited three additional ones. We classify and enumerate the issues as follows:

### Rankin's Appeal

1. The trial judge erred when he refused to enter a default judgment against Burton, Parsons because of the latter's alleged discovery violations, notwithstanding a threat of such sanction by another judge at an earlier time.

2. Judge Miller committed reversible error when he directed a verdict that the contract of employment, claimed by Rankin to provide an enforceable duty by

---

2. We were told during oral argument that Rankin died on the operating table during surgery.

Burton, Parsons to pay royalties, was unambiguous and imposed no enforceable duty to pay royalties.

3. Reversible error was made when the trial judge directed a verdict on *quantum meruit* on the ground that the contract of employment created no duty to pay royalties and whatever was owed had been paid.

4. It was error to grant a directed verdict that the contract of employment created no present or past right to royalties, and there could be no future right to receipt of royalties.

5. It was error to admit into evidence the testimony of John Manfuso, Sr., because that testimony violated the "Dead Man's Statute," Md.Cts. & Jud.Proc.Code Ann. § 9–116.

6. The trial judge erred when he took from the jury Rankin's fraud claim.

*Burton, Parsons's Cross-Appeal*

7. Judge Miller erred when he ruled that the terms "net sales" and "sales in foreign countries," as used in the royalty agreements, were unambiguous, thereby precluding the jury's consideration thereof.

8. It was error to exclude from the jury's consideration two documents that Burton, Parsons sought to introduce into evidence to clarify the terms of an oral agreement to pay royalties.

9. The evidence was insufficient to sustain the jury's award of $750,000 to Rankin.

I.

*Rankin's Appeal*

1.

*The Discovery Ruling*

Rankin asserts that on four separate occasions he filed motions for sanctions against Burton, Parsons because of its failure to obey the Maryland Rules relating to discovery.

On the third such occasion Judge Stanley B. Frosh threatened to enter judgment against Burton, Parsons if it did not comply with Rankin's requests. The fourth and final motion was heard by Judge Miller who refused to sanction Burton, Parsons, notwithstanding Judge Frosh's earlier threat. In this Court, Rankin avers that Judge Miller's declination to enter judgment against Burton, Parsons because of its refusal or failure to obey the discovery rules constitutes an abuse of discretion. We are asked to remand "for the entry of a judgment by default, or for a new trial with facts (sought to be ascertained through discovery) taken as established . . . ." We shall do neither.

The Court of Appeals in *Smith v. Potomac Electric Power Co.,* 236 Md. 51, 202 A.2d 604 (1964), said that dismissal of a claim for failure to comply with discovery was "clearly not mandatory (even if permissible, . . .)." The Court, however, did not decide whether it was permissible but left that issue to another time, indicating that the noncompliance in *Smith* "was not wilful." Later the Court said in *Klein v. Weiss,* 284 Md. 36, 56, 395 A.2d 126, 137 (1978), "There is no contention that the appellees' failure to disclose the information was wilful or contumacious; there is, therefore, no mandatory requirement that the evidence be excluded." In the matter *sub judice,* Judge Miller opined that, "while many items sought were late in arriving, while other items may not have been supplied to the complete satisfaction of . . . [Rankin] . . . there is no indication in the record of a lack of good faith on the part of . . . [Burton, Parsons]. For . . . [those] reason[s] the Court will not impose any sanctions involving . . . a different burden of proof or default."

We have neither been directed to nor have we found any case where following a trial on the merits, a judgment has been reversed simply because of failure to comply with discovery procedures, and a default judgment was subsequently entered against the errant party.

Judge Miller was free to exercise his own judgment in the matter, which is precisely what he did, irrespective of

what another judge might have done. That he found "no indication of a lack of good faith" on the part of Burton, Parsons does not mean that he abused his discretion.

### 2.

### The Employment Contract

The contractual controversy centers completely around the second sentence of section 6 of the above recited contract of employment. That sentence declares:

"However, the vesting of title in Employer, as aforesaid, shall not preclude the parties hereto from negotiating a further agreement for payment to Employee of royalties or other compensation for such inventions, formulas or discoveries as may prove capable of commercial development."

Rankin asserts that because of the second sentence, the agreement is so ambiguous as to require the introduction of extrinsic evidence in order to establish the true intention of the parties. *Keyser v. Weintraub,* 157 Md. 437, 444–45, 146 A. 275, 277 (1929); *see also Masano v. Albritton,* 245 Md. 423, 226 A.2d 299 (1967); *Warner v. Miltenberger's Lessee,* 21 Md. 264, 83 Am.Dec. 573 (1864). Judge Miller, however, did not find the contract to be ambiguous but, rather, unenforceable with respect to an affirmative duty to pay royalties.

Indubitably, the parties agreed to negotiate a further agreement "relative to the payment of royalties or other compensation," subject to a number of factors such as patentability, and public acceptance. Ergo, "no more definite agreement" was attempted. Subsequently, Rankin and Burton, Parsons did enter into "royalty agreements" as to some of the products.

As Rankin reads the contract of employment, Burton, Parsons was obligated to pay royalties on all products created by Rankin for Burton, Parsons. The refusal, failure, or neglect by Burton, Parsons to pay royalties is, in Rankin's view, a breach of contract entitling Rankin to recover such

sums as a factfinder shall determine to be due and owing. We disagree. A factfinder would be required in the instant case to write the royalty agreement before determining damage for its breach. Of necessity, it would have to find that Burton, Parsons should have agreed to pay a definite percentage on each and every product invented by Rankin but manufactured and marketed by Burton, Parsons; what amount, if any, the royalty should be on a particular product; whether the geographical area in which it is marketed should alter the amount of the royalty paid; whether the royalty percentage should be calculated on gross sales or gross sales less a "sales floor," or net sales or net sales less a "sales floor."

■ Ordinarily, commercial agreements to negotiate upon terms and conditions to be decided are unenforceable. *Oil Trading Associates, Inc. v. Texas City Refining, Inc.,* 199 F.Supp. 829 (S.D.N.Y.1961), aff'd, 303 F.2d 713 (2d Cir.1962).

In *Fremon v. W.A. Sheaffer Pen Co.,* 209 F.2d 627 (8th Cir.1954), an inventor sued Sheaffer Pen Co. on the basis of an agreement whereby Sheaffer allegedly contracted to pay to the inventor "amounts representative of the value" to Sheaffer of the invention. The court, affirming a summary judgment entered in favor of Sheaffer, said:

"Clearly more than the amount of compensation was left for future determination. Neither a court nor a jury is authorized to guess what values Fremon and Sheaffer might have placed upon all the factors which were left for their consideration in arriving at a basis on which to determine 'fair compensation' for the value of those rights. The authorities cited and relied upon by the court are in point; and there are many others. *Lynn v. Richardson,* 151 Iowa 284, 288, 130 N.W. 1097; Williston on Contracts (Rev.Ed., 1936), Vol. I, § 45, p. 131; *Gunn v. Newcomb,* 82 Iowa 468, 48 N.W. 989; *National Bank of Kentucky v. Louisville Trust Co.,* 6 Cir., 67 F.2d 97, 102. The law is tersely stated in *Richmond Screw Anchor Co., Inc. v. Umbach,* 7 Cir., 173 F.2d 532, 534, as follows:

'Where an essential element of a contract is reserved for future agreement, no legal obligation as to such element arises until such future agreement is made.'" 209 F.2d at 632.

More recently, the United States District Court for the Southern District of New York (Weenfeld, J.) in *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330 (S.D.N.Y.1982), penned:

"While the power of the Court to fashion in appropriate cases an equitable remedy is great, it does not encompass the right to make an agreement for the parties. To decree ... as plaintiff requests, would require the Court to enter into the realm of the conjectural. An agreement to negotiate in good faith is even more vague than an agreement to agree. An agreement to negotiate is amorphous and nebulous, since it implicates so many factors that are themselves indefinite and uncertain that the intent of the parties can only be fathomed by conjecture and surmise." (Footnote omitted.)

Professor Samuel Williston in *A Treatise on the Law of Contracts,* (W.H.E. Jaeger 3d ed. 1957) § 45 declares:

"Although a promise may be sufficiently definite when it contains an option given to the promissor or promissee, yet if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the very terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise."

Cases illustrative of Williston's declaration are: *Weegham v. Killefer,* 215 F. 168 (W.D.Mich.1914), aff'd, 215 F. 289 (6th Cir.1914) (contract to play baseball "at a salary to be determined" was held invalid); *Harbot v. Pennsylvania R. Co.,* 44 F.Supp. 319 (W.D.N.Y.1942) (contract providing for reasonable compensation to be paid was too uncertain to enforce).

1 *Corbin on Contracts* § 95 states it slightly differently, but with the same "bottom line":

> "A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract." (Footnote omitted.)

See *W., B. & A. R.R. Co. v. Moss,* 127 Md. 12, 96 A. 273 (1915).

█ The overwhelming weight of authority holds that courts will not enforce an agreement to negotiate a contract. Applying that holding, in the matter *sub judice,* it is apparent that no factfinder, jury or nonjury, can determine with any degree of certainty from the vague, indefinite language employed what the parties would have agreed, if anything, in a royalty contract. That Rankin and Burton, Parsons negotiated and agreed upon royalties in some instances does not mean that identical or similar agreements would have been reached on other Rankin creations.

Any royalty agreement in the case at bar would have to take into consideration the 1961 Royalty Agreement words, "patentability, competitive products, public acceptance, etc." Even if the factfinder successfully navigated his way through the straits of "patentability," past the reefs of "competitive products," and into the turbulent waters of "public acceptance," he will surely find himself becalmed in the windless air of "etc." Such a task requires more than a mere factfinder; it requires a Houdini or soothsayer. Courts should confine themselves to the law, not enter the realm of thaumatology.

### 3.

#### Quantum Meruit

Rankin next asseverates that pursuant to the terms of the employment contract, he performed valuable services to Burton, Parsons in return for the reasonable expectation of payment of additional compensation. To buttress his argument, he cites 1 *Corbin on Contracts* § 99. That section states, in pertinent part:

"After goods have actually been delivered and accepted, or services actually rendered and received, the defendant is bound to make reasonable compensation therefor . . . ."

What Rankin either overlooks or ignores is that he was paid compensation in the form of a salary, albeit a minimum salary. All that the parties otherwise agreed was to negotiate what, if any, additional amount in the form of royalties would be paid by Burton, Parsons to Rankin. The parties did negotiate and agree as to some products, *e.g.*, Clens, Soa-Clens, and Soothe, but not others.

When there is an express contract dealing specifically with the services rendered, *quantum meruit* is unavailable. *O'Keeffe v. Bry*, 456 F.Supp. 822 (S.D.N.Y.1978). Any reading of the employment agreement will reveal that Rankin contracted to perform clearly defined services for Burton, Parsons; he agreed that any and all "inventions, formulas or discoveries" that he made were to become the sole property of Burton, Parsons. In exchange, Burton, Parsons agreed that Rankin was to be paid $100 per week and allowed to research and investigate "the development of new pharmaceutical products." The parties further agreed that they could negotiate agreements to pay royalties to Rankin, but they were not required to do so.

We think the appellate court of Illinois quite clearly stated the applicable law when it decided *Industrial Lift Truck Service Corporation v. Mitsubishi International Corporation*, 104 Ill.App.3d 357, 60 Ill.Dec. 100, 432 N.E.2d 999 (1982). The court said:

"The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concern-

ing the same subject matter on which the quasi-contractual claim rests. (Citations omitted.) The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow."

See *Seymore v. Reader's Digest Ass'n., Inc.,* 493 F.Supp. 257 (S.D.N.Y.1980); *Union Building Corporation v. J & J Bldg. & Maint.,* 578 S.W.2d 519 (Tex.Civ.App.1979); *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674 (Tex.1964); *Tondre v. Pontiac School District No. 105,* 33 Ill.App.3d 838, 342 N.E.2d 290 (1975). *See also Bright v. Ganas,* 171 Md. 493, 189 A. 427 (1937).

■ One who expressly assumes certain duties and obligations under a contract may not avail himself of *quantum meruit* to nullify his obligation. *Industrial Lift Truck Service Corporation v. Mitsubishi International Corporation, supra.* Rankin may not have received as much compensation as he deserved, but he received that for which he contracted. He cannot use *quantum meruit* to obtain more.

### 4.
### *Declaratory Relief*

Rankin maintains that Judge Miller erred in failing to permit the jury to pass upon the issue of future royalties. Having previously held that the employment contract with respect to royalties was an agreement to negotiate and not enforceable, it is not necessary to further address the matter.

### 5.
### *The Dead Man's Statute*

■ As we have previously noted, Rankin died the day after his suit was filed against Burton, Parsons. At trial,

John Manfuso, Sr., one of the former owners of Burton, Parsons, testified over objection that Rankin did not complain about the amount of money he was paid by Burton, Parsons. Rankin now asserts that the Dead Man's Statute, Md.Cts. & Jud.Proc.Code Ann. § 9–116, prohibited the testimony because Manfuso was a party to the action. Rankin avers that this is true because Manfuso had been placed on notice that in the event Burton, Parsons was held liable to Rankin, it would seek indemnification from Manfuso.

The statute provides, in pertinent part:

"A party to a proceeding by or against a personal representative ... in which a judgment or decree may be rendered for or against them ... may not testify concerning any transaction with or statement made by the dead ... person, personally or through an agent since dead, unless called to testify by the opposite party ...."

This Court, speaking through Judge Lowe in *Trupp v. Wolff,* 24 Md.App. 588, 602, 335 A.2d 171 (1975), *cert. denied* 275 Md. 757 (1975), said:

"Maryland is in accord with the general rule.... The persons excluded from testifying are not those with an interest of any sort, but rather traditional real parties in interest and their representatives."

The statute and *Trupp* make clear that Manfuso was not a party, nor was he an agent of a party. In light of the contingent indemnity he did possess a contingent interest, but the mere possibility of indemnification is not enough to create a direct pecuniary or proprietary interest in the outcome of the litigation. *Reddy v. Mody,* 39 Md.App. 675, 388 A.2d 555, *cert. denied,* 283 Md. 736 (1978). Without such direct interest, Manfuso does not attain the status of a traditional real party in interest and, therefore, is not precluded from testifying under the Dead Man's Statute.

6.

*Jury Instructions on Fraud and Punitive Damages*

■ To recover in Maryland in an action for fraud, the plaintiff must show:

1. the representation to the plaintiff, by the defendant, was false;

2. its falsity was either known to the defendant or the misrepresentation was made with such reckless disregard for the truth as to be the equivalent of actual knowledge of its falsity;

3. the misrepresentation was made for the purpose of defrauding the plaintiff;

4. the plaintiff relied upon the misrepresentation, had a right to rely upon, and would not have done so but for the misrepresentation; and

5. the plaintiff sustained damage as a direct result of the misrepresentation.

Cases reiterating those five factors are legion. The five factors have become so ingrained in our law that citations in support of them are no longer necessary.

■ Rankin asserted at trial that he relied upon the "false royalty accountings" made to him by his employer Burton, Parsons. Because he alleges that the royalty accountings were "repeatedly" false, he avers that a jury could find that "the Defendants engaged in a plan, scheme or design to defraud" him. The reason the royalty statements were false, Rankin says, is that they failed to disclose certain "methodical calculations of various discounts" taken by Burton, Parsons "before the sales figures were transferred to the [royalty] statements ... [furnished to] Dr. Rankin."

Our review of the record extract does not reveal any evidence that the royalty statements were false. Thus, the first of the five factors of fraud is conspicuous by its absence. As Burton, Parsons observes, no evidence has been offered by Rankin that demonstrates what additional information, if any, was required to be included in the royalty statements.

Rankin seemingly places reliance for his fraud claim upon comments made by the trial judge when the judge refused

to grant a directed verdict in favor of Burton, Parsons at the conclusion of Rankin's evidence. The judge commented:

"With respect to the fraud claim, the Court feels in looking at the evidence in the light most favorable to the plaintiff as I must at this juncture and giving the plaintiff the benefit of all inferences, that reasonable minds could conclude that based upon the actions of the defendant, that it could have been fraudulent and that they could from the evidence at least deduce at this juncture conclude that there is fraud in connection with the failure to disclose the true amount of the royalties due. For that reason I will deny any Motion for Directed Verdict regarding any fraud claim."

Later, at the conclusion of all the evidence, the judge granted Burton, Parsons's motion for a directed verdict. Apparently because of the judge's statement made at the time he rejected the final motion for directed verdict, Rankin asserts that, "It is clear from the record that [the] standard of introducing slight evidence [was met] and . . . [Rankin was] entitled to a factual determination of the fraud claim."

We think Rankin's argument must fall for two reasons: 1) the trial judge was free to change his mind with respect to his earlier ruling if he believed he was wrong in the first instance; and 2) there was, as we have previously said, no evidence establishing the first of the five factors of fraud, notwithstanding the judge's initial view of Rankin's evidence. Inasmuch as the first of the five factors of fraud is missing from Rankin's evidence, Judge Miller properly declined to allow the jury to consider any claim of fraud.

## II.

### The Cross-Appeal

### 7.

### Oral Modification of Royalty Agreements

#### A. Domestic Net Sales

The jury, as we have already remarked, awarded Rankin $750,000 on the breach of contract claim based upon the

failure of Burton, Parsons to pay to Rankin all of the royalties due and owing. In this Court, Burton, Parsons argues that the agreement to pay royalties on the basis of "net sales" as used in the Royalty Agreements of 1961 and 1968 was ambiguous, and because "net sales" was vague and uncertain, testimony should have been allowed to show oral modifications of the agreements.

 "Net sales" is defined in both royalty agreements to mean:

> "[T]he amount actually received by . . . [Burton Parsons] or by affiliated companies, less returned merchandise, cash discounts and other trade discounts, on sales made in the United States, its territories and dependencies."

The definition of what the parties meant by "net sales" is clear. Parol evidence will not be allowed for the purpose of explaining, contradicting, or modifying the terms of an unambiguous contract. *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982); *Housing Authority of College Park v. Macro Housing, Inc.*, 275 Md. 281, 340 A.2d 216 (1975); *Delmarva Drilling Company, Inc. v. Tuckahoe Shopping Center, Inc.*, 268 Md. 417, 302 A.2d 37 (1973), *overruled, rev. on other grounds* in *Martens Chevrolet v. Seney*, 292 Md. 328, 336, 439 A.2d 534 (1982).

### B. Foreign Sales

The 1961 and 1968 Royalty Agreements, in addition to providing for royalties on net sales in the "United States, its territories and dependencies," also provided for royalties on foreign sales. The agreements stated with respect to foreign sales, and without defining "net sales" differently, that insofar as the product known as Clens was concerned, Burton, Parsons would "pay to Rankin a royalty equivalent to 2 percent of *net sales* of Clens in foreign countries." (Emphasis supplied.) With respect to Soa-Clens "a royalty equivalent to 2 percent of *net sales*" (emphasis supplied) of that product "in foreign countries" was to be paid to Rankin. The agreement as to the product "Soothe" was the same as that of "Soa-Clens."

The jury was told that there was insufficient evidence from which it could find any oral modification of the 1961 or 1968 Royalty Agreements. They were further told that when the language is clear, the words are to be given their "usual meaning regardless of what [the] parties intended." "Only when the language of the contract is unclear," Judge Miller said, is the jury allowed to decide what the parties meant by any word the jury determined to be ambiguous.

The term "net sales" is, as we have said, clear. The term "in foreign countries" is unambiguous. All that the two terms together mean is net sales in foreign countries. Net sales under the agreement are net sales irrespective of whether they occur in the United States, its dependencies or elsewhere.

We think Burton, Parsons got far more than it was entitled to receive, because they were permitted to argue to the jury the meaning of foreign sales.

### 8.

### *Exclusion of Two Documents Relative to Royalties*

Burton, Parsons endeavored unsuccessfully to introduce into evidence a paper writing that it said was "prepared at the time of the acquisition [of Burton, Parsons by Alcon] and the written description of the two percent royalty arrangements on the four Adsorbobase documents which were prepared by the old officers of Burton, Parsons . . . at the time of the purchase . . . ." We think the documents inadmissible. The paper writing was at best a hearsay, self-serving declaration that was prepared for purposes of the sale of the company by Burton, Parsons to Alcon. In any event, it was not a contemporaneously prepared business record made in the regular course of business. Md.Cts. & Jud.Proc.Code Ann. § 10-101(b). Although the record is unclear as to when the document was prepared, it is manifest that it was done in anticipation of the 1979 sale to Alcon and not at the time of the alleged agreement with Rankin in 1961 or 1968.

A second document, a letter to Dr. Manuel Shpritz, was sought to be introduced to show that royalties were not applicable to foreign sales of a product manufactured in the foreign country. What Burton, Parsons tried to do was show that since Shpritz received no royalties on products manufactured in foreign countries, Rankin likewise was not to receive them. This, of course, is a *non sequitur.* That Shpritz may or may not have received certain concessions or made certain agreements is totally irrelevant, and Judge Miller correctly excluded it from the jury's consideration.

### 9.
### *The Sufficiency of the Evidence*

Burton, Parsons expostulates that the jury used improper mathematical calculations to arrive at its verdict. The verdict as returned by the jury, however, was a general one and, based on the record before us, unless the cross-appellant is clairvoyant it has no way, short of pure conjecture, of ascertaining how the jury reached its conclusion that Burton, Parsons was truly and justly indebted unto Rankin in the amount of $750,000.

JUDGMENT AFFIRMED.

EACH PARTY TO PAY ONE–HALF THE COSTS.