William J. **EISELE**, Appellant (Plaintiff),

v.

Jane J. **RICE**, William Woolston, IV, Jill Woolston Flack, Valerie Rice Kobold, Jeff Woolston and Lisa Rice Wilmer, Appellees (Defendants).

No. 96–254.

Supreme Court of Wyoming.

Dec. 10, 1997.

---

James P. Castberg, Sheridan, for Appellant.

Dan B. Riggs, Haultain E. Corbett and Jonathan A. Botten of Lonabaugh and Riggs, Sheridan, for Appellees.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

TAYLOR, Chief Justice.

Appellant challenges the district court's grant of summary judgment in favor of appellees on his claim of *quantum meruit*. Appellant claims there are material facts which support his claim that appellees wrongfully refused to compensate him for his services in the sale of appellees' stock in John E. Rice & Sons, Inc.

We affirm.

## I. ISSUES

Appellant, William J. Eisele (Eisele), presents the following issues for review:

I. The trial court erred in its findings of fact that it was unclear after the contract expired, as to whether the plaintiff was working for the buyers of the defendants' stock, or for the defendants.

II. The trial court erred in its findings of fact that before the defendants sold their stock, the plaintiff had an opportunity to have the defendants consider payment of a commission to him, and he refused to have them consider payment at that time.

III. The trial court erred in its conclusion of law that to allow restitution to be made in this case would involve a violation or frustration of law or opposition to public policy because of the undisputed facts set forth in the findings of fact in the court's order.

IV. That the court erred in its ruling that there were no genuine issues of material fact in this case and that as a matter of law, the defendants are entitled to a summary judgment in their favor.

Appellees, the majority and minority shareholders of John E. Rice & Sons, Inc., phrase the issues as follows:

A. Did the trial court correctly rule that Plaintiff failed to prove the elements of a *quantum meruit* claim?

B. Did the trial court correctly rule that there are no disputed issues of material fact which would preclude summary judgment?

C. Is *quantum meruit* or unjust enrichment available as a remedy to revive or alter an expired contract?

D. Did the trial court correctly rule that to allow Plaintiff to recover on his *quantum meruit* claim would frustrate law or public policy?

## II. FACTS

This appeal arises from Eisele's claim that he is legally entitled to payment for his efforts leading to the sale of the corporate stock of John E. Rice & Sons, Inc. (the corporation). The primary asset of the corporation was a large tract of land known as the "Wrench Ranch" (the ranch) located just north of Sheridan, Wyoming. The ranch was established in the 1940's by John E. Rice and his wife, Ruth, and, in 1950, the family-run ranching operation was incorporated. At the time relevant to this action, the corporation's shares of stock were owned by majority shareholders, Jane J. Rice, William Woolston IV and Jeff Woolston, and minority shareholders, Jill Woolston Flack, June Warren (Eisele's sister), her children Lisa Rice Wilmer and Valerie Rice Kobold.

The following recitation of facts is taken from Eisele's deposition testimony. In late 1992, the minority shareholders brought suit against the majority shareholders. The lawsuit resulted in a settlement in December 1993 in which the parties agreed to liquidate the assets and dissolve the corporation. Learning from his sister that the ranch was to be sold, Eisele contacted Jane Rice and informed her that he knew of prospective buyers for the ranch.

Undeterred by his lack of a license to sell securities or real estate, Eisele again contacted Jane Rice in late April or early May 1994. Eisele informed Jane Rice of the name of a potential buyer and requested permission to show the ranch to the prospective buyer. Eisele's request was denied, and he was instructed to have the prospective buyer accompanied by William Woolston IV. According to Eisele, this instruction led him to understand that appellees did not want to be obligated to him in respect to the sale, and that he would need a written agreement to insure compensation.

Around the same time, Eisele also contacted two other prospective buyers, and with the permission of appellees, showed the ranch. Eisele stated that he believed if he could find a buyer for the ranch and bring them to the table, he would be able to negotiate a commission for himself at the same time he negotiated the sale. Neither of these prospective buyers, however, wanted to make an offer.

Although the record is unclear as to the exact time, prior to May 7, 1994 Eisele also toured the ranch with James "Butch" Jellis (Jellis) and Neltje (a prospective buyer who requested her identity be kept confidential). Afterwards, Jellis telephoned Eisele to let Eisele know that Neltje was interested in buying the property. Eisele deliberately withheld Neltje's identity from appellees because "[Neltje] * * * didn't want anybody to know she was interested in it."

Discussions between Eisele and Neltje progressed, and Eisele provided available information regarding the property and the corporation. Eisele then approached Jane Rice and William Woolston IV and told them he had an interested buyer. Eisele also stated he would like a written agreement to receive a commission if his interested buyer bought the ranch. The parties executed a written contract which provided that effective May 7, 1994, Eisele would receive a commission of four percent if: (1) he produced a qualified purchaser; (2) with an offer acceptable to the shareholders; and (3) within thirty days. The contract further provided that any modification or change in terms must be set forth in writing signed by all shareholders.[1]

During the thirty-day period that the contract was in effect, Eisele did not disclose Neltje's identity and no offer for the ranch or the stock was presented. In June 1994, after the contract period had terminated, Eisele told Jane Rice that Neltje was his prospective buyer, but that Neltje was no longer interested in buying the ranch.

Eisele took no further action regarding the ranch until the late summer or fall of 1994. At that time, he had brief contact with another prospective buyer, but testified he did not expect compensation for these efforts in the event of a sale. Eisele stated he met with the prospective buyer because he "was wanting to see them get it sold. My niece was involved and my sister and everybody was going to benefit from it."

In early 1995, Jellis contacted Eisele and informed him that Neltje was again interested in purchasing the ranch. Eisele then called his niece, Lisa Rice Wilmer, to relay the information. Eisele testified he had no more involvement regarding the ultimate sale to Neltje, but that all further negotiations were conducted between the prospective buyer, the sellers, and their lawyers.

However, Eisele also testified that in the meantime, he was involved in negotiations between the minority shareholders and Neltje to form a partnership. The partnership was intended to form the basis of an offer to purchase two-thirds of the corporation's stock, and if the partnership did not work out in the future, Neltje could buy out the remaining shares retained by the minority shareholders at $1.00 more per share than the original purchase offer. Eisele did not

---

1. Appellee Lisa Rice Wilmer did not sign the agreement.

apprise the majority shareholders of these negotiations and testified he did not expect compensation for his involvement because these were "a different group of buyers * * *." Pursuant to the negotiations, on February 7, 1995, Neltje and Jellis made an offer to purchase two-thirds of the corporation's stock.

On February 9, 1995, another purchase proposal was submitted by Dan Scott, who offered to buy all of the stock of the corporation at ten cents more per share than the Neltje/Jellis offer. Eisele's niece, Lisa Rice Wilmer, gave Eisele a copy of the Scott offer and told Eisele that the majority shareholders were inclined to accept. Although Eisele could not testify with certainty, he admitted it was likely that he passed this information on to Jellis even though Eisele had not received authority to do so.

The first Neltje/Jellis offer was rejected on February 10, 1995 with a counter-offer proposal setting the price for the majority shares at fifty cents more per share. Through Jellis, Eisele learned that Neltje believed the counter-offer price was too high. Again, Eisele did not inform the shareholders of this conversation. At some time, Neltje also told Eisele she did not believe the partnership would work out and she planned to make an offer on her own. However, Neltje did not discuss the time or terms of the offer.

Unbeknownst to Eisele, Neltje and Jellis presented a second offer on February 13, 1995 in which they offered to purchase all the shares of the corporation at a price five cents per share higher than the Scott offer. The offer was conditioned on written acceptance within one day, and the shareholders complied.

It is uncontested that Eisele did not discuss his expectation of a commission between the time of the acceptance and until days before the deal was closed on May 12, 1995. On May 1, 1995, Eisele's attorney sent a letter to all shareholders asserting Eisele's right to receive a four percent commission from the sale. A few days before the closing, Eisele filed a lawsuit against the corporation, his sister, and the appellees alleging breach of the contract for commission. After the corporation and Eisele's sister were volun-tarily dismissed from the lawsuit, appellees filed a motion for summary judgment. In his response to appellees' summary judgment motion, Eisele for the first time raised his theory of *quantum meruit.*

On January 24, 1996, the district court issued its decision letter granting summary judgment in favor of appellees, and on February 5, 1996, issued its order and dismissed Eisele's complaint. On August 1, 1996, the district court entered a stipulated order for final judgment, and Eisele timely filed this appeal.

## III. STANDARD OF REVIEW

"Summary judgment is appropriate when no genuine issue of material fact exists and when the prevailing party is entitled to have a judgment as a matter of law." *Sandstrom v. Sandstrom,* 884 P.2d 968, 971 (Wyo.1994).

"A genuine issue of material fact exists when a disputed fact, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. The party moving for summary judgment bears the initial burden of establishing a prima facie case for a summary judgment. If the movant carries this burden, the party opposing the summary judgment must come forward with specific facts to demonstrate that a genuine issue of material fact does exist."

* * * We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. * * * We evaluate the propriety of a summary judgment by employing the same standards and by using the same materials as were employed and used by the lower court.

*Adkins v. Lawson,* 892 P.2d 128, 130 (Wyo. 1995) (*quoting Thunder Hawk by and through Jensen v. Union Pacific Railroad Co.,* 844 P.2d 1045, 1047 (Wyo.1992)).

## IV. DISCUSSION

Eisele alleges he is entitled to reasonable compensation for his services in locating,

identifying and providing buyers to enter into an agreement with appellees for the purchase of their stock in the corporation. We need not look further than Eisele's own deposition testimony and affidavit to affirm the ruling of the district court.

■ Having abandoned his breach of contract claim, Eisele's appeal is based solely on his claim under a theory of *quantum meruit. Quantum meruit,* or unjust enrichment, provides for the recovery of damages on a contract implied in equity. *State v. BHP Petroleum Co., Inc.,* 804 P.2d 671, 672 n. 3 (Wyo. 1991) (*quoting Johnson v. Anderson,* 768 P.2d 18, 25 (Wyo.1989)). This equitable doctrine is based on the theory that

> "one person should not be permitted to unjustly enrich himself at the expense of another, but should be required to make restitution * * * for property or benefits received * * * where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly."

*BHP Petroleum Co., Inc.,* 804 P.2d at 672 (*quoting R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.,* 781 P.2d 910, 912 (Wyo.1989)).

■ As an initial matter, we note that Eisele's claim must be founded on his efforts and legitimate expectations arising *after* the written contract expired. *Adkins,* 892 P.2d at 131; *Smart & Golee, Inc. v. Delany,* 65 Ill.App.2d 60, 213 N.E.2d 27, 30 (1965). In Eisele's affidavit submitted for the purpose of opposing summary judgment, he stated:

> On or about May 7, 1994, after showing the ranch property to Mr. Jellis and Neltje, I obtained an agreement from the Defendants * * * which agreement gave me thirty (30) days to present an offer of sale * * * to the shareholders of the corporation for their stock.

Eisele agrees that he did not obtain or submit an offer within the time limits specifically designated in the written contract. Thus, it is undisputed that Eisele did not provide the services which entitled him to a commission under the terms of the contract. Neither can Eisele revive his contract nor extend its terms under a theory of *quantum meruit. Hershey Foods Corp. v. Ralph Chapek, Inc.,*

828 F.2d 989, 999 (3rd Cir.1987); *J.A. Moore Const. Co. v. Sussex Associates Ltd. Partnership,* 688 F.Supp. 982, 988 (D.Del.1988); *First Nat. Bank of Maryland v. Burton, Parsons & Co., Inc.,* 57 Md.App. 437, 470 A.2d 822, 829, cert. denied, 300 Md. 90, 475 A.2d 1201 (1984); 66 Am.Jur.2d, *Restitution and Implied Contracts,* § 6 (1973).

■ To succeed on his claim under *quantum meruit,* Eisele must prove that after the expiration of his contract: (1) valuable services were rendered to appellees; (2) which services were accepted, used and enjoyed by appellees; (3) under such circumstances which reasonably notified appellees that Eisele, in rendering the service, expected to be paid by thèm; and (4) without such payment, appellees would be unjustly enriched. *Adkins,* 892 P.2d at 131; *Bowles v. Sunrise Home Center, Inc.,* 847 P.2d 1002, 1004 (Wyo.1993); *Zitterkopf v. Bradbury,* 783 P.2d 1142, 1144 (Wyo.1989).

Eisele failed to establish any material fact which might demonstrate that he provided valuable services *to appellees* under circumstances which would give notice of a reasonable expectation of payment. Eisele first contends that the shareholders knew he continued to provide valuable services to appellees by meeting with a prospective buyer in the late summer or fall of 1994. However, Eisele agrees that this effort did not culminate in an offer of purchase, and admits he did not expect compensation for that effort.

Eisele also points to his involvement in the revived negotiations with Jellis and Neltje in January 1995. Eisele's deposition testimony, however, clearly shows that "his involvement" was not for the benefit of all appellees, and he again admits he did not expect payment for his participation in the offer to buy two-thirds of the stock.

Moreover, there is nothing in the record which indicates that appellees accepted any services from Eisele under circumstances which reasonably notified appellees that Eisele expected to be paid. Eisele testified that he knew he must have a written agreement to entitle him to a commission for the sale of the ranch prior to the agreement in May 1994. There is nothing in the record which indicates that the relationship which

generated the need for a written agreement changed in any way after the agreement expired.

A careful review of Eisele's deposition testimony reveals he did not speak with any of the appellees regarding his continuing expectation that he would receive a commission from them. Instead, Eisele relies on unspecified conversations in which his nieces allegedly stated that he would receive a commission. Eisele also points to a conversation he had with Jeff Woolston in December 1994 or early 1995 in which Jeff Woolston allegedly stated he "was glad that [Eisele] was getting a commission * * *." However, Eisele failed to rebut the affidavits of his nieces which stated that references to a commission were made in the context of the understanding that Eisele would be receiving compensation from Jellis and Neltje.

Finally, Eisele's actions were a direct violation of public policy. Although Eisele believed he was acting as an "agent" for appellees, he failed to inform his "principals" of vital information and perhaps passed on information which was highly confidential. There is nothing in the record which supports Eisele's equitable claim.

## V. CONCLUSION

Eisele failed to show that he performed any services on behalf of appellees after the expiration of an express agreement. Neither is there any evidence that services were performed under circumstances in which appellees were reasonably notified of an expectation of payment. Summary judgment is affirmed.