**ABT ASSOCIATES, INC., Plaintiff,**

v.

**JHPIEGO CORPORATION, Defendant.**

**No. CIV. H–99–3238.**

United States District Court,
D. Maryland.

July 5, 2000.

Robert K. Taylor, Patton Boggs, LLP, Washington, DC, for Plaintiff.

Susan F. Martielli, Associate General Counsel, Johns Hopkins University, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

Plaintiff Abt Associates, Inc. ("Abt") has here sued defendant JHPIEGO Corporation ("JHPIEGO") for breach of contract and under various other contract and tort theories. The dispute between the parties arises as a result of an award made by the United States Agency for International Development ("USAID") to JHPIEGO whereby the latter would provide support services for USAID's maternal and neonatal health care efforts undertaken in developing countries around the world (the

"MNH Program"). In its complaint, plaintiff Abt has alleged that defendant JHPIEGO promised that Abt would have a major role in the technical direction and oversight of the MNH Program and that, after JHPIEGO received the USAID award, it excluded Abt from the program entirely. Diversity jurisdiction exists.

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in extensive discovery. Presently pending before the Court is a motion for summary judgment filed by defendant JHPIEGO. The parties have submitted lengthy memoranda and voluminous exhibits in support of and in opposition to the pending motion, including excerpts from numerous depositions taken during discovery. A hearing on the pending motion has been held in open court. For the reasons stated herein, defendant's motion for summary judgment will be granted.

I

*Background Facts*

Abt is a Massachusetts corporation involved in policy research and analysis relating to health care financing, policy and delivery systems. JHPIEGO is a nonprofit Maryland corporation affiliated with Johns Hopkins University ("JHU") which has in the past managed global projects establishing training systems for health care professionals.

On March 26, 1998, USAID issued a preliminary notice of its intention to solicit applications for entering into a five year cooperative agreement (the "Award") to further USAID's MNH Program. Both Abt and JHPIEGO were interested in this Program, and in May of 1998, Abt contacted JHPIEGO concerning the possibility of a "partnering" or "teaming" agreement. The parties then discussed the formation of a joint bidding group for the purpose of submitting an application to USAID.

On June 15, 1998, USAID issued a formal request for the submission of applications for the Award. In this request, USAID indicated that the estimated funding for the MNH Program would be approximately $60 million. The actual funding for the program was to be provided to the Award recipient on an annual basis and would come from the following two sources: (1) core funds from USAID headquarters in Washington; and (2) field support funds from USAID offices and missions around the world. Of the estimated $60 million in funding, approximately $20 million was expected to come from core funds, and the balance would be supplied as field support from USAID's overseas missions.

USAID requested that applicants for the Award submit a two part application. The first part was a technical application in which applicants were required to respond to seven questions concerning the obstacles which would be faced by the recipient of the Award and concerning such recipient's strategies to address those obstacles. The second part was a cost application designed to demonstrate to USAID the cost consciousness of the applicants.

Over the course of the three weeks following USAID's request for applications, JHPIEGO, Abt, and three other prospective team members (collectively the "Team")[1] met and discussed the Team's structure, management and staffing, and the preparation of an application to be submitted to USAID. It was during these meetings that Abt's prospective role in the Team was discussed. Abt was to have a role in the technical direction of the proposed program. Three and one-half full-time key core personnel for the MNH Program were to be contributed by Abt. Further, it was decided that Abt would be paid a fee for its work in the MNH Program which, pursuant to USAID policy,

---

1. The other team members were the Johns Hopkins University Center for Communication Programs ("JHU/CCP"), the Program for Appropriate Technology in Health ("PATH"), and the Center for Development and Population Activities ("CEDPA").

would require Abt and JHPIEGO to enter into a separate subcontract. The Team members decided amongst themselves that, although JHPIEGO would serve as the principal of the Team if it was selected as the Award recipient, all decisions concerning the operation of the MNH Program would be reached collaboratively.

On June 25, 1998, members of the Team met to discuss specifically the technical approach that would be used in the application to be submitted to USAID. Abt prepared and presented materials explaining a so-called "Systems Approach" which Abt had previously proposed for use in the health care area. Abt's approach was adopted by the group and became the strategic core of the technical application.

During the course of their discussions, Team members also considered the cost application. None of the proposed applicants knew for certain the particular countries in which their services would be needed if their proposed team was selected. This was because the extent of the services offered by the MNH Program would not be known until USAID overseas missions actually requested the services after the MNH Program became operational. Thus, the cost application served merely as an illustrative tool. Abt's prospective budget amounted to approximately $13 million, which included core operations costs, Abt's fee, and field support costs. In late June, JHPIEGO sent a "Teaming Agreement" to Abt and other Team members. The Teaming Agreement set forth JHPIEGO's understanding of the relationships between it and the various other parties. The stated purpose and sole intent of the Teaming Agreement was "to enable JHPIEGO and the Subrecipient to enter into a subagreement in the event that JHPIEGO is awarded a Cooperative Agreement based on its application." The Agreement also indicated that, should JHPIEGO receive the Award, it would use "its best efforts to negotiate a subagreement with the Subrecipients for work" on the MNH Program. All of the Team members, with the exception of Abt, executed and returned the Teaming Agreement. On July 6, 1998, Abt sent a letter to JHPIEGO stating that "Abt . . . is pleased to be a partner on the JHU Team led by JHPIEGO . . . on the implementation of the [MNH Program]."

Throughout the summer, Abt devoted time and resources helping JHPIEGO with the drafting of the application to USAID. The initial application submitted to USAID indicated that there would be a "strong institutional partnership . . . [consisting] of a core group of . . . entities led by JHPIEGO as the award recipient, along with Abt, PATH and CEDPA." The application also stated that "JHPIEGO will enter into subagreements with the institutional partners so that each institution will have the financial resources to participate and support the MNH Program." The application also noted that five of the twelve individuals proposed for the core professional positions in the MNH Program, holding the equivalent of three and one-half full-time positions, were either employed by or were committed to work for Abt.

On August 6, 1998, USAID sent JHPIEGO a letter requesting responses to certain questions in order to facilitate a better understanding of the application which had been submitted. The questions concerned, in relevant part, the possibility of staffing proposed part-time positions as full-time positions, the Team's management structure, and the location of the Team's headquarters. Staff members of the Team helped draft and prepare the responses to USAID's questions. Responding to USAID's inquiries about the program headquarters, Abt and JHPIEGO agreed that Dr. Katherine Krasovec, an Abt employee who would be serving as the Team's Deputy Director of Technical Operations, would communicate with the Team's Baltimore headquarters twice a week and would work at a proposed satellite office in Washington, D.C.

On August 25, 1998, USAID requested that the Team make an oral presentation concerning its proposed MNH Program. Abt played a role at the oral presentation before USAID on September 1, 1998, and on September 8, 1998, JHPIEGO submitted a final technical and cost application to USAID. That application did not contain specific references to other proposed Team members. On September 28, 1998, JHPIEGO was notified that it had been selected as the Award recipient.

A Cooperative Agreement was then entered into between USAID and JHPIEGO. That Agreement provided that since the Award was to be "incrementally funded, only [$4.7 million]" had been obligated by USAID for the MNH Program. The Cooperative Agreement also provided that USAID's "total obligation under the Cooperative Agreement is contingent upon transfers of funds from USAID's Overseas Missions from which payments for Cooperative Agreement programmatic purposes can be made."

Shortly after receiving the Award, JHPIEGO met with Abt and began preliminary discussions relating to provisions of a subagreement between the parties. JHPIEGO requested that two of the part-time positions in the MNH Program to be held by Abt personnel be combined into one. JHPIEGO also told Abt at the meeting that it wanted Mary Kroeger, a midwife affiliated with Abt and slated by the parties to work in the MHN Program, to be brought on more slowly than the parties had originally anticipated. Abt agreed to both changes. JHPIEGO also indicated to Abt that it should go ahead and hire Melahi Pons and Susan Scriber, two individuals recruited by Abt to work on the MNH Program. However, no final agreement concerning the terms of the subagreement was reached at this meeting.

Preliminary steps were then begun to implement the MNH Program. JHPIEGO and Abt entered into a so-called "pre-subagreement," designed to cover Abt's costs until a final subagreement could be executed by Abt and JHPIEGO. The initial presubcontract covered the period from October 6, 1998 to October 30, 1998 and totaled $25,000. The agreement was later amended to extend the coverage period to November 6, 1998. The amount of the obligation assumed by JHPIEGO for Abt's presubcontract costs was accordingly increased to $30,750.

On October 19, 1998, JHPIEGO forwarded to Abt a draft "technical services contract." This draft was not acceptable to Abt. Abt viewed the draft as not accurately reflecting the previous discussions between the parties which had served as the basis for JHPIEIGO's application. The draft subagreement covered only a term of eleven months rather than the five year term of the Award. The draft also required Abt to cap its indirect cost rates although no such cap had previously been discussed and none was required by USAID. JHPIEGO had also proposed that Abt's first year budget be limited to $724,787, which was the amount of core funding contained in the final budget submitted to USAID for three and one-half full-time positions for Abt personnel.

Abt and JHPIEGO met on October 29, 1998 to discuss the terms of the draft subagreement. Abt asked JHPIEGO to revise its earlier draft to make it consistent with the parties' pre-Award discussions. Abt requested that the subcontract include, pursuant to provisions of the application, a five year term, the same scope of work, language emphasizing the existence of a partnership between the parties, and budget figures for Abt's projected five year costs. A letter requesting these revisions was sent by Abt to JHPIEGO.

On November 18, 2998, JHPIEGO responded and sent Abt a letter, together with a revised draft subagreement. The revised draft changed many of the earlier provisions which Abt had found objectionable. However, JHPIEGO refused to include in the revised draft Abt's budget figures which would have obligated

JHPIEGO to pay Abt's projected five year costs. JHPIEGO also amended the original draft to include a provision permitting termination of the subcontract at JHPIEGO's convenience.

JHPIEGO also requested that Abt submit a budget for only the first year of the program. In discussions with Abt's financial officer, JHPIEGO had indicated that the budget should include salaries for only three full-time Abt employees, rather than the three and one-half full-time Abt employees included in the original draft. Mary Kroeger, Abt's midwife, was not included as part of the proposed Abt staff which would serve as core personnel in the MNH Program. JHPIEGO informed Abt that it would agree for Mary Kroeger to provide short-term technical assistance only during the first year. The letter also advised Abt that JHPIEGO wanted to finalize the subcontract by Friday, November 20, 1998.

On November 20, 1998, JHPIEGO contacted Abt and inquired as to the status of the revised draft subagreement. Abt explained that it was still in the process of reviewing the draft. JHPIEGO also asked why Abt had not submitted a first year budget to JHPIEGO. Abt responded that it was concerned about JHPIEGO's failure to include Mary Kroeger as a full-time core personnel and that it could not submit a budget until this issue was resolved.

On Monday, November 23, 1998, JHPIEGO advised Abt that it would not be entering into any type of business or contractual relationship with Abt.[2] JHPIEGO indicated that the grounds for terminating negotiations were the differences between the parties concerning Abt's profit and cost sharing allocation and concerning the amount of time that Abt personnel would spend at the Baltimore office of the MNH Program.

Soon after terminating negotiations with Abt, JHPIEGO solicited several Abt employees, offering them positions working for JHPIEGO on the MNH Program. Melahi Pons, Abt's Health Finance Advisor, was hired by JHPIEGO a few weeks later. On December 16, 1998, JHPIEGO submitted to USAID its draft first year workplan for the MNH Program. In its workplan, JHPIEGO utilized a "Health Systems Approach" similar to the Systems Approach suggested by Abt during the application process. The workplan also provided for a "midwifery advisor" to serve as one of the core personnel.

On March 4, 1999, Abt presented a bill to JHPIEGO for services rendered by it through November 23, 1998, inasmuch as the presubcontract between Abt and JHPIEGO had covered merely the period up to November 6, 1998. JHPIEGO paid that bill in full. Abt did not do any work on the MNH Program after November 23, 1998. On October 26, 1999, Abt filed a seven count complaint in this Court seeking substantial damages from JHPIEGO.

## II

### Plaintiff's Claims

In Count I of the complaint, plaintiff Abt seeks a recovery for breach of contract. It is alleged that Abt and JHPIEGO entered into a binding contract to be partners in competing for and performing the MNH Program. The material terms of the contract are alleged to be discussions, correspondence and other documents prior to the Award of the Cooperative Agreement.

Count II alleges that defendant JHPIEGO breached its duty of good faith and fair dealing undertaken by it as an obligation of the contract between the parties. In Count III, plaintiff Abt seeks a recovery based on a theory of *quantum meruit.*

Count IV asserts a claim of unjust enrichment. It is alleged that JHPIEGO induced Abt to forego joining a competing team and to reveal valuable ideas and information, including Abt's Systems Approach, which were used by JHPIEGO in

**2.** JHPIEGO did enter into subagreements with the other prospective Team members.

its application and later in the performance of the Cooperative Agreement. Count V seeks a recovery under a theory of promissory estoppel.

In Count VI, Abt charges JHPIEGO with fraud. It is alleged that Abt relied to its detriment on JHPIEGO's misrepresentations of material fact. Count VII asserts a claim of tortious breach of contract.

As relief, plaintiff Abt seeks compensatory damages in excess of $500,000, punitive damages in the amount of $5,000,000, attorneys' fees and costs.

### III

*Summary Judgment Principles*

A defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claims alleged. *See* F.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 106 S.Ct. 2548.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted as to all counts of the complaint.

## IV

### *Discussion*

#### (a)

#### *Count I—Breach of Contract*

In this diversity case, Maryland law is controlling. It is black letter law in Maryland that "[a] contract is an agreement which creates an obligation ... and such agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations ..." *Post v. Gillespie*, 219 Md. 378, 384, 149 A.2d 391 (1959). "A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean." *Beckenheimer's Inc. v. Alameda Assoc. Ltd. Partnership*, 327 Md. 536, 547, 611 A.2d 105 (1992).

"[O]ne of the essential elements for formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms." *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489, 463 A.2d 829 (1983). Conversely, "[t]he failure to agree on ... an essential term of a contract may indicate that the mutual assent required to make ... a contract is lacking." *Klein v. Weiss*, 284 Md. 36, 63, 395 A.2d 126 (1978). "It is essential that the minds of the parties be in agreement on terms in order for a contract to be established." *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir.1986).

Whether parties negotiating a contract intended to be bound by a prior writing or whether they did not intend to be bound until a formal agreement was prepared and signed by them must be determined from the facts and circumstances in each case. *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273 (1948). In *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F.Supp. 1181 (D.Md.1990), *aff'd* 937 F.2d 603 (4th Cir.1991), this Court considered the circumstances under which a letter of intent might constitute a binding contract. This Court stated:

> [l]etters of intent and negotiations ordinarily do not constitute binding contracts and will not be enforced by the courts, in part because "the financial community does not regard [a letter of intent] as a binding agreement, but rather, an expression of tentative intentions of the parties." *Dunhill Securities Corp. v. Microthermal Applications, Inc.*, 308 F.Supp. 195, 198 (S.D.N.Y. 1969)

*Id.* at 1187.

▉ This Court also indicated that, as noted in *Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y. 1987), a letter of intent which expressly stated that it would be binding was an enforceable contract. *Phoenix*, 734 F.Supp. at 1187. The Court there outlined the following five factors to determine whether the facts of a case revealed an intent by the parties to a letter of intent to be bound: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions. *Id.* Continual redrafting of a document indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of a written agreement. *Waterfall Farm Sys., Inc. v. Craig*, 914 F.Supp. 1213, 1223 (D.Md.1995).

▉ Applying these principles to the facts of record here, this Court concludes as a matter of law that no binding and enforceable agreement was ever reached between plaintiff Abt and defendant JHPIEGO whereby Abt would participate in the MNH Program. Evidence does not exist to indicate that the parties intended to bind themselves to any enforceable contract other than the presubcontract which was fully performed. Correspondence and other documents exchanged between the parties, documents submitted to USAID

and the unsuccessful negotiations concerning the execution of a subagreement between Abt and JHPIEGO all constitute conclusive evidence that no final and binding agreement was reached between the parties. The fact that the parties could not agree on the terms and conditions of the subagreement during their negotiations after defendant's receipt of the Award is significant evidence that there was no prior binding contractual relationship between them.

Plaintiff Abt relies heavily on the application submitted by JPHIEGO to USAID. Plaintiff argues that the parties agreed to be partners in the MNH Program and that this agreement is confirmed by the reference to plaintiff as a "partner" in a draft of the application. According to plaintiff, the application contained all the essential terms of a binding contract. This Court must disagree.

That the written correspondence between the parties referred to plaintiff as a "partner" cannot constitute a binding enforceable agreement between the parties because that correspondence did not contain essential material terms of a final agreement between Abt and JHPIEGO. Accordingly, no contract arose under Maryland law. *See Safeway Stores, Inc.,* 296 Md. at 489, 463 A.2d 829; *Klein,* 284 Md. at 63, 395 A.2d 126; *Marmott,* 807 F.2d at 1184. It is significant that plaintiff, unlike other members of the Team, refused to sign a Teaming Agreement which detailed the nature and scope of the relationship between the parties prior to the execution of a subagreement.

Nor does the record here indicate that any binding agreement arose under provisions of the application submitted by JHPIEGO to USAID. The application is not even a letter of intent in the traditional sense in which letters of intent have been understood. *See Phoenix,* 734 F.Supp. at 1187. Plaintiff Abt did not sign the application and was not the intended recipient of the document. Defendant's application amounted to no more than an exchange between defendant JHPIEGO and USAID which led to the execution of the Cooperative Agreement between JHPIEGO and USAID.

Even if the application could be considered to be a letter of intent, it did not amount to a binding contract between the parties. For a letter of intent to be binding on the parties, it must expressly indicate the parties' intention to be bound by the document. *Id.* Applying the five factors set forth in *Teachers* and adopted in *Phoenix,* this Court concludes that no binding agreement was ever reached. The language of the application indicates that the team members later "will enter into subagreements." In their later negotiations, Abt and JHPIEGO attempted to reach a subagreement but were unsuccessful because they could not mutually agree on several of the essential terms. The inability of the parties here to mutually agree on essential terms of the subagreement is demonstrated by the continual drafting and redrafting of the document which was never executed by them following the Award. *See Waterfall Farm Sys.,* 914 F.Supp. at 1223. The other team members did sign subagreements and accordingly did thereafter participate in the MNH Program.

Moreover, there were numerous open terms, the most significant one being the amount to be paid to Abt for the services to be rendered by it. The application referred to a five year budget with approximately $13 million being allotted to plaintiff Abt. Defendant JHPIEGO was unwilling to guarantee this entire amount in the subagreement because the estimated $60 million to be appropriated for the MNH Program was not guaranteed funding.

Plaintiff argues that it partially performed the contract by assisting defendant JHPIEGO in preparing the application. However, what plaintiff characterizes as partial performance was no more than what a party would normally undertake as

a cost of doing business for which it could not reasonably be expected to be compensated. After the Award, plaintiff Abt was fully compensated for its expenses under the "presubagreement" entered into by the parties. This agreement stated that its purpose was to cover plaintiff's post-award costs "pending finalization of the formal subcontract between [the parties]." The language of the presubagreement clearly establishes that there could be no binding agreement between the parties until the subagreement itself was executed. Pursuant to the terms of the presubagreement, JHPIEGO paid Abt the sum of $42,800 for costs and expenses incurred by Abt during the period after the Award from October 6 to November 23, 1998.

A significant fact here is that Abt readily agreed to the terms of the presubagreement. If a binding contract between the parties already existed when they signed the presubagreement, there would have been no need for Abt to enter into the proposed subcontract. Abt's compensation would have been fixed by the terms of the prior binding contract. The clear intent of the presubagreement was to permit Abt to be paid while the parties were negotiating the terms of the formal subcontract.

Relying on *ATACS Corp. v. Trans World Com., Inc.*, 155 F.3d 659, 666 (3d Cir.1998), plaintiff argues that it is customary when bidding on a government contract for a subcontractor to assist the prime contractor's bid submission in return for the prime contractor's promise to enter into an agreement with the subcontractor. Such reliance is misplaced. The facts present in *ATACS* are quite different from those present here. In *ATACS*, the Third Circuit based its decision on the fact that a teaming agreement existed between the parties. *ATACS*, 155 F.3d at 667. Here, plaintiff Abt never signed the proposed "Teaming Agreement," although one was executed by the other partners. The record here discloses that the only binding agreement between the parties was the presubagreement which clearly stated that

its purpose was to cover plaintiff's post-award costs "pending finalization of the formal subcontract . . ."

The type of contract initially contemplated by the parties in this case is one which parties would normally reduce to a comprehensive writing before they would bind themselves legally. As this Court stated in *Phoenix*, 734 F.Supp. at 1187–1188:

> As the Court noted in *Kona Hawaiian Associates v. Pacific Group*, 680 F.Supp. 1438, 1454 (D.Haw.1988), business entities ordinarily do not enter into multimillion dollar transactions in the absence of a comprehensive writing. *See also Millman v. Wetterau Inc.*, Civil No. H–88–1331, slip. op at 14, 1989 WL 206582 (D.Md. June 6, 1989) (complex transactions do not become binding merely as a result of extended oral discussions). The large amounts involved and the complexity of this transaction highlight the practical business need to have the parties' legal obligations recorded in formal documents. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–63 (2nd Cir.1984). As the *Teachers* Court noted, there is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document. *Teachers*, 670 F.Supp. at 499.

In sum, the record in this case indicates that the parties could not agree on the terms of the contemplated subagreement. Accordingly, no final writing was ever executed by them. As a matter of law, this Court finds and concludes that throughout the course of their negotiations, plaintiff Abt and defendant JHPIEGO never reached an agreement whereby Abt would participate in the MNH Program. Accordingly, summary judgment in favor of defendant will be granted as to the claim asserted by plaintiff in Count I of the complaint.

(b)

## Count II—Duty of Good Faith and Fair Dealing

■ Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 534, 200 A.2d 166 (1964). However, Maryland courts have not explicitly recognized a separate cause of action for breach of this duty. In *Parker v. The Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992), the Court of Special Appeals stated that the implied duty of good faith "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* at 366, 604 A.2d 521. However, the Court did not go further and hold that this duty required a lender to take affirmative action not required by the loan documents. *Id.*

Defendant JHPIEGO seeks summary judgment as to Count II on the ground that Maryland courts and this Court do not recognize a separate cause of action for breach of the duty of good faith and fair dealing. This Court would agree. In *Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 677 (D.Md.1993), Judge Smalkin of this Court held that Maryland does not recognize a separate cause of action for breach of the implied duty of good faith and fair dealing. In *Baker v. Sun Co., Inc.,* 985 F.Supp. 609, 610 (D.Md.1997), Judge Young of this Court concurred and held that a separate cause of action for breach of the implied duty of good faith and fair dealing will not lie in Maryland. The undersigned agrees with those rulings. A plaintiff seeking a recovery for breach of contract may not in Maryland assert a separate claim for breach of the covenant of good faith and fair dealing implied in that contract.

For the reasons stated in both *Howard Oaks* and *Baker,* this Court concludes that defendant JHPIEGO is entitled to summary judgment as to Count II of the complaint.

(c)

## Count III—Quantum Meruit

■ A recovery under a theory of *quantum meruit* generally "is not applicable when compensation of the parties is covered by an express written contract." *Mass Transit Admin. v. Granite Constr. Co.,* 57 Md.App. 766, 775–76, 471 A.2d 1121 (1984). The rationale of a claim based on a theory of quasi-contract is that a defendant should not be unjustly enriched by a benefit bestowed upon it by the plaintiff. *Id.* at 776, 471 A.2d 1121. When there is no real promise by defendant to pay plaintiff, the law thus implies such a promise. *Id.* Conversely, where an actual promise to pay does exist, there is no need to imply one. *Attorney Grievance Comm'n v. McIntire,* 286 Md. 87, 93, 405 A.2d 273 (1979).

In *First Nat'l Bank v. Burton, Parsons & Co.,* 57 Md.App. 437, 451, 470 A.2d 822 (1984), the Court of Special Appeals stated succinctly that, "when there is an express contract dealing specifically with the services rendered, quantum meruit is unavailable." The court in *First Nat'l Bank* further stated:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. (Citations omitted.) The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-con-

tract for recovery. This the law will not allow.

*Id.* (citation omitted).

██ Plaintiff has argued that it expected to be compensated over the life of the MNH Program for having assisted defendant in its submission of the USAID application and that defendant had notice of this expectation of plaintiff. According to plaintiff, as a result of defendant's termination of negotiations and subsequent enjoyment of the benefits of the services conferred upon it by plaintiff, a sustainable claim of *quantum meruit* may be asserted.

This argument is meritless. It is apparent that plaintiff did not reasonably expect to be compensated for its pre-award services, in as much as there was no guarantee that defendant would receive the Award. Services and costs incurred by plaintiff in the pre-award period amounted to no more than the costs of doing business. Any compensation which plaintiff could have reasonably expected to have received would arise only from post-award services rendered by plaintiff while terms of the subagreement were being negotiated. Here, plaintiff was fully compensated for such post-award services pursuant to the terms of the presubagreement. An actual promise to pay did in fact exist and was fulfilled. Under Maryland law, no quasi-contract claim can arise when a contract in fact exists between the parties concerning the same subject matter upon which the quasi-contractual claim rests. *Attorney Grievance Comm'n,* 286 Md. at 93, 405 A.2d 273; *Nat'l Bank,* 57 Md.App. at 451, 470 A.2d 822.

Since plaintiff is not entitled under the circumstances here to assert a claim for pre-award services and since defendant complied with the agreement between the parties covering plaintiff's post-award services, no claim based on a theory of *quantum meruit* can be asserted by plaintiff in this case. Accordingly, summary judgment in favor of defendant will also be entered as to Count III of the complaint.

(d)

### Count IV—Unjust Enrichment

██ Three elements must be established by a plaintiff to support a claim of unjust enrichment: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28 (1980). The measure of recovery for unjust enrichment is the gain to the defendant, not the loss by the plaintiff. *Mass Transit Admin.,* 57 Md.App. at 775, 471 A.2d 1121.

██ Plaintiff has contended that the benefit conferred upon the defendant which would entitle it to a recovery under a theory of unjust enrichment constitutes plaintiff's foregoing the joining of a competing team which would seek the Award and plaintiff's sharing with defendant of valuable ideas and information including the Systems Approach which was and is being used by defendant. This claim must also fail. That plaintiff did not undertake to join a competing team cannot under the circumstances here be deemed to constitute a benefit conferred upon defendant. There was no guarantee that, had plaintiff in fact joined a competing team, that team would have received the Award. Plaintiff has thus failed to demonstrate that any retention by the defendant of this so-called benefit is inequitable. *Everhart,* 47 Md. App. at 136, 422 A.2d 28.

Moreover, because of the intangible nature of this alleged benefit, there is no evidence in the record concerning the value of such benefit on which any recovery by plaintiff could be based. Since the measure of a recovery for unjust enrichment is the gain by the defendant and not the loss by the plaintiff, no claim of unjust enrichment may be asserted by plaintiff in the absence of evidence establishing the

amount of defendant's enrichment. *Mass Transit Admin.*, 57 Md.App. at 775, 471 A.2d 1121.

Accordingly, summary judgment in favor of defendant will also be entered as to Count IV.

(e)

*Count V—Promissory Estoppel*

■ To recover under a theory of promissory estoppel, a plaintiff must satisfy the four part test of the Restatement (Second) of Contracts § 90(1). That test, which has been adopted by the Court of Appeals of Maryland, requires the plaintiff to show: (1) a clear and definite promise; (2) a reasonable expectation by the defendant that the offer will induce action or forbearance on the part of the plaintiff; (3) actual and reasonable action or forbearance by the plaintiff; and (4) detriment to the plaintiff which can only be avoided by the enforcement of the promise. *Pavel Enter., Inc. v. A.S. Johnson Co., Inc.*, 342 Md. 143, 166, 674 A.2d 521 (1996).

■ On the record here, this Court concludes that plaintiff may not present to a jury its claim for relief based on the theory of promissory estoppel. Damages in an amount exceeding $500,000 have been claimed by plaintiff, "including reasonably foreseeable lost profits." However, the only available remedy to a plaintiff seeking relief under a theory of promissory estoppel is "the enforcement of the promise." *Pavel*, 342 Md. at 166, 674 A.2d 521. Because plaintiff has not in Count V requested the only remedy available to it under a claim of promissory estoppel, judgment in favor of defendant must be entered as to Count V.

■ Moreover, even if an appropriate equitable remedy had been sought, plaintiff's claim under Count V would still fail because plaintiff has not produced evidence showing any demonstrable detriment suffered by it. Plaintiff contends that its reliance upon defendant's alleged promise to enter into a formal contract forced it to forego joining a competing team and also forced it to reveal valuable information to defendant. However, as noted hereinabove, competent evidence does not exist in this record that these factors resulted in actual detriment to plaintiff. Plaintiff's claim is therefore speculative at best. Had plaintiff joined a competing team, there is no guarantee that this other team would have received the Award. Similarly, there is no evidence in the record here indicating that plaintiff suffered any actual loss such as the loss of other business by providing defendant with its "valuable ideas and information." Abt had no proprietary interest in its Systems Approach, an approach which was already available in the public domain and which was widely used by others.

For all these reasons, plaintiff's claim based on a theory of promissory estoppel must fail. Accordingly, defendant's motion for summary judgment will also be granted as to Count V of the complaint.

(f)

*Count VI—Fraud*

■ In order to prevail in an action seeking a recovery for fraud, a plaintiff must prove: (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Nails v. S & R*, 334 Md. 398, 415, 639 A.2d 660 (1994). Fraud must be proven by clear and convincing evidence. *Everett v. BGE*, 307 Md. 286, 300, 513 A.2d 882 (1986). Many cases involving issues of fraud are not suited for disposition by way of a motion for summary judgment because of the need for factual development. However, "when there is no genuine issue of material fact, summary

judgment may be appropriate." *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.,* 126 Md.App. 294, 311, 728 A.2d 783 (1999).

■ Plaintiff's claim of fraud alleged in Count VI must also fail. On the record here, the Court concludes that plaintiff Abt cannot show by clear and convincing evidence that the alleged misrepresentations made by defendant JHPIEGO were knowingly fraudulent or were made with reckless indifference as to their truth, or that plaintiff had the right to and did rely on them.

In Count VI of the complaint, plaintiff alleges that defendant made numerous misrepresentations of material fact which induced it to collaborate with defendant. These alleged misrepresentations concerned defendant's intentions regarding plaintiff's role in the MNH Program. But absent in the record here is any clear and convincing evidence that these alleged misrepresentations were made for the purpose of defrauding the plaintiff, or were made with reckless indifference as to their truth. *See Nails,* 334 Md. at 415, 639 A.2d 660. In the absence of such proof, a claim of fraud must fail. *Everett,* 307 Md. at 300, 513 A.2d 882; *Nails,* 334 Md. at 415, 639 A.2d 660. Plaintiff is here seeking to prove fraud inferentially by asserting that defendant's statements concerning its expectations as to plaintiff's role in the MNH Program were never realized and that they therefore must have constituted fraud. Proof of this sort does not amount to clear and convincing evidence of knowingly fraudulent misrepresentations or of misrepresentations made with reckless indifference as to their truth.

For these reasons, defendant is also entitled to the entry of summary judgment in its favor as to Count VI of the complaint.

(g)

*Count VII—Tortious Breach of Contract*

■ Where the essence of a relationship between the parties is contractual in nature and the basis for the claim of defendant's dereliction is its failure to perform the contract, the cause of action arising from such dereliction is not available in a tort action but only in an action for breach of contract. *Baird v. C & P Tel. Co. of Baltimore,* 208 Md. 245, 258–59, 117 A.2d 873 (1955). There is no cause of action for tortious interference with a contract when suit is brought against a party to the contract. *Parks v. CAI Wireless Systems, Inc.,* 85 F.Supp.2d 549, 556 (D.Md.2000). It is therefore widely recognized that a party cannot be liable for tortious interference with his own contract. *Id.* A defendant which tortiously breached its own contract would clearly be tortiously interfering with that contract.

Applying these principles to the facts alleged in Count VII of the complaint, this Court concludes that defendant is entitled to the entry of summary judgment in its favor as to plaintiff's claim of tortious breach of contract. In Count VII, plaintiff has alleged that the parties entered into a binding contract and that defendant tortiously breached that contract. A claim of this sort is not maintainable under Maryland law. As the Court of Appeals of Maryland held in *Baird,* a cause of action sounding in tort is not permitted where the essence of the claimed injury is defendant's failure to perform the contract. *Baird,* 208 Md. at 258–59, 117 A.2d 873. The appropriate cause of action under such circumstances is a claim for breach of contract. *Id.*

For these reasons, the Court has concluded that plaintiff may not go forward with the claim asserted by it in Count VII of the complaint. Summary judgment in favor of defendant will therefore also be entered as to Count VII.

V

*Conclusion*

In sum, it is apparent in this case that plaintiff has sought to impose liability on defendant because of the failure of the

parties to reach a final agreement during their negotiations. The complaint contains a veritable laundry list of legal theories whereby plaintiff has sought to impose liability on the defendant. There has been extensive discovery, and a very substantial record has been presented to the Court. But try as it might, plaintiff Abt has not been able to fit the facts of record into any viable theory which would support a recovery from defendant JHPIEGO. *Phoenix,* 734 F.Supp. at 1186.

From the Court's review of the facts of record in this case, it is apparent that the parties, after extended negotiations, were unable to agree on the final terms of a subagreement which would be acceptable to both sides. Since no binding contract resulted, plaintiff Abt was not permitted to participate as a partner of defendant JHPIEGO in providing services for the MNH Program. In the absence of a binding agreement, there could be no breach by JHPIEGO. Moreover, plaintiff has suffered no losses because of any tortious conduct on the part of defendant.

For all the reasons stated, defendant's motion for summary judgment will be granted as to all seven counts of the complaint. An appropriate Order will be entered by the Court.