**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: PREMIER AUTOMOTIVE
SERVICES, INCORPORATED,
*Debtor.*

MARYLAND PORT ADMINISTRATION,
*Movant-Appellee,*

v.

PREMIER AUTOMOTIVE SERVICES,
INCORPORATED,
*Respondent-Appellant.*

No. 06-2207

PREMIER AUTOMOTIVE SERVICES,
INCORPORATED,
*Plaintiff-Appellant,*

v.

ROBERT L. FLANAGAN, Secretary,
Department of Transportation, State
of Maryland, and Chairman,
Maryland Port Commission; F.
BROOKS ROYSTER, III, Executive
Director, Maryland Port
Administration,
*Defendants-Appellees.*

No. 06-2208

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:06-cv-01733-WMN; 1:06-cv-01761-WMN; 05-bk-20168-JS;
05-0137)

Argued: March 14, 2007

Decided: June 15, 2007

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** Charles Samuel Fax, RIFKIN, LIVINGSTON, LEVI-TAN & SILVER, L.L.C., Greenbelt, Maryland, for Appellant. Philip P. Whaling, OFFICE OF THE ATTORNEY GENERAL, Maryland Port Authority, Baltimore, Maryland, for Appellees. **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, Baltimore, Maryland, for Appellees.

---

## OPINION

WILKINSON, Circuit Judge:

These consolidated cases demonstrate, unfortunately, how the good and useful ends of the bankruptcy process can be badly abused. The Chapter 11 petition filed by the debtor, Premier Automotive Services, pressed a variety of claims intended, not for the legitimate purposes of bankruptcy, but to invoke the automatic stay and other bankruptcy code protections in order to forestall eviction on an obviously expired lease. The bankruptcy court dismissed the petition, finding that Premier had filed it in bad faith, solely "to prevent the State from evicting the debtor from [the State's] property," and as a "means to the end of tying up the State in endless, fruitless litigation." The district court affirmed, noting that while Premier's constitutional claims "abound in legal creativity, they generally lack legal merit." We agree with both courts and affirm the judgment.

## I.

This dispute arises out of a commercial lease of approximately six and one half acres of land ("Lot 90") owned by the Maryland Port Administration ("MPA") and located on Dundalk Marine Terminal on the Baltimore waterfront. Debtor-Plaintiff Premier Automotive Services ("Premier") is an import-export motor vehicle company which processes trucks, as well as heavy military, agricultural, and construction equipment through Dundalk Marine Terminal. Premier has been operating on Lot 90 for over forty years under a variety of leases and is the current possessor of Lot 90. At the beginning of its occupancy, Premier constructed a 27,500 square-foot building on Lot 90 which contains an office, body shop, paint shop, and washline.

Defendant MPA is an agency of the State of Maryland which oversees and operates port facilities. Md. Code Ann., Transp. 6-102(f) (LexisNexis 2003). MPA's purpose is to increase the waterborne commerce of Maryland ports, and, by doing so, to benefit Maryland residents. *Id.* § 6-102(c)(1). In this, the agency is granted statutory authority to lease port facilities to private parties like Premier. *Id.* § 6-204(i).

Premier Automotive Services' most recent lease for Lot 90 was executed in July 1992 and expired on June 30, 2002. Before the July 1992 lease expired, MPA met with Premier to discuss lease renewal, and tendered to Premier a five-year lease. Premier objected to a vehicle throughput requirement, which required Premier to guarantee that it would move 1700 vehicles per acre per year through Lot 90, and the lease was never executed. Premier did not, however, quit the premises after the old lease expired. Instead, Premier remained in possession of Lot 90 as a holdover tenant on a month-to-month basis.

In February 2004, following a year and a half of unsuccessful negotiations over a long-term lease, MPA offered Premier a month-to-month lease. The February 2004 lease did not contain a throughput requirement. Premier again rejected MPA's proposal, deeming the month-to-month lease unacceptable because it would not provide long-term stability.

In April of 2004, after further lease negotiations, MPA offered Premier a three-year lease with two one-year renewal options. In

response to Premier's throughput objection, MPA informed Premier that it had "committed every vehicle tenant at the Dundalk Marine Terminal and other facilities to a throughput that makes the most efficient and effective use of our limited terminal land." In MPA's view, the 1,700 vehicle per acre per year requirement allocated to Premier was "more than achievable since the [acreage] used to calculate the guarantee is less than 50% of [Lot 90]." MPA requested that Premier execute the lease by April 15.

On April 30, 2004, MPA wrote to Premier expressing frustration over the parties' failure to come to terms on a new lease. The April 30 letter informed Premier that the Maryland Port Administration was extending the signing deadline for the April 2004 lease until May 15, 2004, but noted that the lease must be signed by that date. The parties, however, failed once again to reach agreement.

On January 4, 2005, MPA entered into a five-year lease with Pasha Automotive Services ("Pasha") for acreage on the Dundalk Marine Terminal, and, on June 15, 2005, Lot 90 was designated for Pasha. Pasha committed to a minimum throughput of 1,700 vehicles per acre (on each of Lot 90's 6.54 acres) and also agreed to a relocation clause, which gave MPA the discretion to move Pasha to another location on the Dundalk Marine Terminal at MPA's expense.

In March 2005, the Maryland Department of Transportation advised Premier that MPA had entered into a long term lease with another tenant — Pasha — for Lot 90. And, on March 29, 2005, MPA sent Premier a letter which terminated Premier's month-to-month tenancy effective May 1, 2005. MPA subsequently offered Premier a 60-day extension (until June 30, 2005) in exchange for Premier waiving any objection the company had to vacating Lot 90. Premier declined the offer.

On April 29, 2005, Premier filed a Chapter 11 bankruptcy petition in federal bankruptcy court in the District of Maryland. Premier invoked the automatic stay provisions of 11 U.S.C. § 362(a) (2000), and alleged, in a related adversary proceeding, a variety of constitutional violations against MPA, then-Secretary of the Maryland Department of Transportation Robert L. Flanagan, and MPA Executive Director F. Brooks Royster, III. The bankruptcy court held two

evidentiary hearings, and then granted MPA's motion for summary judgment in the adversary action, ordered the automatic stay lifted, and dismissed Premier's Chapter 11 petition. More specifically, the bankruptcy court held that Premier had filed the bankruptcy petition in bad faith — "for the sole purpose of halting and/or delaying [Premier's] ultimate eviction from the Terminal by MPA." The court also dismissed the petition on the grounds that an expired lease was not "property of the estate" under 11 U.S.C. § 541(b): A "bankruptcy court has no authority to resuscitate a lease of real property that expired by its own terms prepetition," the court wrote. Premier appealed to federal district court.

While the bankruptcy proceedings were pending, Premier filed a complaint with the Federal Maritime Commission ("FMC") based upon the same facts underlying the bankruptcy case. Premier alleged a number of violations of the Federal Shipping Act. *See* 46 App. U.S.C. § 1709(d)(1), (3), (4) (now codified at 46 U.S.C. §§ 41102(c), 41106(2)-(3)). The Administrative Law Judge dismissed the petition on sovereign immunity grounds. Premier appealed that decision to the FMC, where it remains pending. Following dismissal of its FMC petition, Premier filed its second action in federal district court seeking injunctive relief pending final judgment on the FMC appeal pursuant to 46 U.S.C. App. § 1710(h)(2).

The district court consolidated the bankruptcy appeal and the FMC complaint. The district court then affirmed the bankruptcy court's grant of summary judgment against Premier finding that "Premier's constitutional claims are unsupportable." The court then concluded that, because these unsupportable claims "were the only 'property' of the bankruptcy estate" claimed by Premier, the petition must be dismissed and the automatic stay lifted. Finally, the district court dismissed Premier's Shipping Act complaint for injunctive relief based in part on its conclusion that Premier "clear[ly]" could not "demonstrat[e] its entitlement to an injunction." Premier now appeals.

II.

We must determine as an initial matter whether the bankruptcy court properly dismissed Premier's Chapter 11 petition as a bad faith filing and an abuse of the bankruptcy process. "We review the bank-

ruptcy court's ultimate finding that the filing was not in good faith as one of fact subject to the clearly erroneous standard." *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989).

## A.

The right to file a Chapter 11 bankruptcy petition is conditioned upon the debtor's good faith — the absence of which is cause for summary dismissal. *Id.* at 698; *Mich. Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 392 (6th Cir. 1992). Indeed, the ability of a bankruptcy court to conduct a threshold inquiry into the good faith of a petitioner is "indispensable to proper accomplishment of the basic purposes of Chapter 11 protection." *Carolin*, 886 F.2d at 698. As this court has explained, "a good faith requirement 'prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.'" *Id.* (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)). The good faith standard also "'protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those debtors and creditors with clean hands.'" *Id.* (quoting *In re Little Creek Dev. Co.*, 779 F.2d at 1072).

In this circuit, a lack of good faith in filing a Chapter 11 petition requires a showing of "objective futility" and "subjective bad faith." *Id.* at 700-01. The objective test focuses on whether "there exists the 'realistic possibility of an effective reorganization.'" *See Carolin*, 886 F.2d at 698 (quoting *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)); *id.* at 701-02; *see also In re Coleman*, 426 F.3d 719, 728 (4th Cir. 2005). The subjective test asks whether a Chapter 11 petition is motivated by an honest intent to effectuate reorganization or is instead motivated by some improper purpose. *Carolin*, 886 F.2d at 702. Subjective bad faith is shown where a petition is filed "to abuse the reorganization process," or "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay." *Id.*

## B.

Premier contends that the bankruptcy court erred in dismissing its petition as a bad faith filing under the criteria set forth in *Carolin*

*Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989). In Premier's view, its multi-pronged litigation strategy presents "a clear path towards reorganization of its business — namely, a reasonable and fair offer of a lease." And, Premier asserts, "it is clear that Premier filed for protection under Chapter 11 in good faith" because "Premier needs Lot 90 and the Building, or their functional equivalent, in order to be in business."

We disagree. There is substantial evidence in the record that supports the bankruptcy court's findings of both objective futility and subjective bad faith. With respect to *Carolin*'s objective futility inquiry, Premier clearly had no "realistic possibility of an effective reorganization." *Carolin*, 886 F.2d at 698. Premier in fact never filed a proposed plan of reorganization. Instead, Premier maintains that its "plan for reorganization *is* this litigation." Quite apart from the fact that Premier had no cognizable property interest in its expired lease of Lot 90, *see Chesapeake Bank v. Monro Muffler/Brake, Inc.*, 891 A.2d 384, 391 (Md. Ct. Spec. App. 2006), and no right to judicially compelled negotiations, *see infra* Part III.A, its reorganization-qua-litigation strategy was, as the bankruptcy court found, "wholly illusory." Indeed, even if Premier were somehow to get the relief it requests, that relief would not lead to an effective reorganization. Thus, the bankruptcy court concluded that Premier's lease dispute belonged in "the State [of Maryland's] Courts" and there is "no possible mechanism in bankruptcy by which the debtor can achieve a legitimate reorganization."

With respect to *Carolin*'s second prong of subjective bad faith, the record also supports the bankruptcy court's finding that Premier filed its petition for an impermissible purpose. Premier had no demonstrable need to reorganize when it filed the petition: it was not, the bankruptcy court found, even "experiencing financial difficulties." Indeed, Premier's bankruptcy filings reveal a solvent business entity with no unsecured creditors and few, if any, secured creditors. This fact alone may justify dismissal of Premier's Chapter 11 petition. As one of our sister circuits has noted, courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11." *In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) (citing cases).

Beyond Premier's solvency, other circumstances support the bankruptcy court's finding of subjective bad faith. The bankruptcy court found that Premier's "only nemesis" was MPA and that it was "not the failure of the State to negotiate in good faith that created the impasse between the parties, but the inability of the parties to come to terms on a new lease." The court further found that Premier's adversary claims against MPA were dependent upon its right to a lease of Lot 90 — a matter of state contract law. Premier did not, however, choose to avail itself of the obvious state law remedies before bringing its Chapter 11 petition, providing further evidence of bad faith. The eleventh-hour filing of Premier's bankruptcy petition also supports the bankruptcy court's ruling. Premier filed its petition on April 29, 2005 — just one day before the company was legally obligated to quit the premises.

In light of all this evidence, the bankruptcy court concluded that "Premier filed the instant bankruptcy case for the sole purpose of halting and/or delaying its ultimate eviction from the Terminal by MPA," "to compel the Maryland Port Administration to execute a new lease to the debtor on terms more favorable than those the State found acceptable," and as a "means to the end of tying up the State in endless, fruitless litigation." Holding an asset hostage is not a permissible use of the bankruptcy process, however. Chapter 11 is not a procedural vehicle which may be commandeered solely for "the purpose of invoking [its] automatic stay." *Carolin*, 886 F.2d at 702. The bankruptcy court properly assessed Premier's Chapter 11 filing under the *Carolin* criteria and properly found it wanting.

### C.

Aside from this general deficiency, Premier's bankruptcy petition was properly dismissed on the particular grounds that property of the estate does not include, and the automatic stay does not apply to, an expired lease of nonresidential property. A mere possessory interest under an expired lease is insufficient to trigger an automatic stay under 11 U.S.C. § 362(a). *See* 11 U.S.C. § 362(b)(10) (2000). Section 362 excludes from its protections nonresidential real property leases that expire "before the commencement of or during a case." The statute provides, in part:

> The filing of a petition . . . does not operate as a stay . . . of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property.

*Id.*

Here, Premier's lease expired on June 30, 2002, and Premier remained as a month-to-month holdover tenant, whose tenancy was terminable at the will of the State of Maryland as landlord. *See* Md. Code Ann., Real Property § 8-402 (LexisNexis 2003). On March 29, 2005, MPA informed Premier that its month-to-month tenancy would end effective May 1, 2005. Thus any leasehold interest that Premier had in Lot 90 expired on that day. Since 11 U.S.C. § 362(b)(10) excludes nonresidential real property leases that expire "before the commencement of or *during a case*" from Section 362(a)'s automatic stay provisions, Premier's Lot 90 lease is not subject to those provisions.

Moreover, 11 U.S.C. § 541(b)(2) excepts from "property of the estate" any interest a debtor has in a nonresidential lease that has "terminated at the expiration of the stated term of such lease." 11 U.S.C. § 541(b)(2). It provides that:

> Property of the estate . . . ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case.

*Id.* Here, because Premier's month-to-month tenancy expired on May 1, 2005, the bankruptcy estate "cease[d] to include any interest" that Premier had in the Lot 90 lease on that day. In sum, since an expired lease is neither property of the estate nor subject to Section 362(a)'s automatic stay provisions, *see* 11 U.S.C. §§ 362(b)(10), 541(b)(2), we must affirm the district court's dismissal of the bankruptcy petition and its order lifting the automatic stay.

### III.

Premier contends that it may nonetheless maintain its bankruptcy petition — its Lot 90 interests aside — because the constitutional claims asserted in its adversary action are property of the bankruptcy estate. The courts below, however, properly recognized Premier's constitutional claims as unsupportable attempts to circumvent the bankruptcy law's various bars to Premier's filing.

### A.

The first count of Premier's adversary complaint alleges that MPA denied it a property interest without due process of law in violation of the Fourteenth Amendment. Premier no longer argues that it has a property interest in the expired lease or the building located on Lot 90. Instead, Premier now claims a constitutional property interest in the "right to fair negotiations with the state in the leasing of state-owned property" and in the "right to do business." It is elementary that "[p]roperty interests are not created by the Constitution." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Rather, they must arise "from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlements to those benefits." *Id.*

It is anything but clear that Maryland would recognize a right to fair negotiation in the absence of an existing contract. *See, e.g.*, *ABT Assocs., Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000); *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) (Motz, J.) (holding that although a duty of good faith and fair dealing may be "implied in certain contracts," this duty only requires a party to the contract "to exercise good faith in performing its contractual obligations"). In all events, there is no "property right" in one negotiating party to have another agree to contract on commercially disadvantageous terms. The essence of Premier's claim is simply that MPA would not agree to what it wanted — that, at most, is "a unilateral expectation" which the Supreme Court has held does not create a constitutional property interest. *See, e.g.*, *Roth*, 408 U.S. at 577.

And even if Maryland law were construed to compel some sort of supervised negotiation, the most Premier could claim would be a right

to process. But process is not property. Indeed, procedural rights have not been held "property right[s] in the constitutional sense." *Lim v. Cent. Dupage Hosp.*, 871 F.2d 644, 648 (7th Cir. 1989); *Walentas v. Lipper*, 862 F.2d 414, 419 n.1 (2d Cir. 1988) (holding that a duty of good faith and fair dealing was not a property interest under the due process clause); *Stone Mountain Game Ranch, Inc. v. Hunt*, 746 F.2d 761, 764 (11th Cir. 1984) (per curiam) (holding that tenants have "no property right when renewal negotiations fail"). Thus Premier's unilateral expectation that judicially compelled lease negotiations might culminate in agreement "does not rise to the level of a constitutionally protected interest." *Stone Mountain Game Ranch*, 746 F.2d at 765 (citing *Roth*, 408 U.S. at 577). In the case at hand, all Premier "can claim to have lost is an entitlement [it] never had" to a lease that neither it nor MPA ever agreed to. *Lim*, 871 F.2d at 647.

Premier also argues that the "right to pursue a lawful business is a constitutionally protected interest." The only interference with the so-called "right to do business" that Premier has ever identified, however, is MPA's failure to lease Lot 90 to Premier. But as found by the district court, "Premier has no legitimate entitlement to a new lease for Lot 90." The company is not, therefore, constitutionally entitled to do business on Lot 90. *See, e.g.*, *Groos Nat. Bank v. Comptroller of Currency*, 573 F.2d 889, 897 (5th Cir. 1978) (plaintiffs "cannot claim a constitutionally protected right to do business with a particular bank"). The recognition of such a broad "right to do business," "would be akin to that [recognized] in *Lochner v. New York*, 198 U.S. 45 (1905), and its progeny, which the Supreme Court has long since refused to recognize." *Turner v. Dammon*, 848 F.2d 440, 445 n.3 (4th Cir. 1988).

Premier's substantive due process claims fail additionally for the reason that the State of Maryland's actions bespeak accommodation, not arbitrary and unjustifiable governmental action. As the district court found, the record reveals "no evidence to undermine the conclusion that, in negotiating with Premier, MPA was acting in a reasonable manner to advance legitimate goals, consistent with its legislated purpose." MPA's three year negotiation efforts do not, under any view, fall "beyond the outer limits of legitimate governmental action." *See Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995).

## B.

Premier next claims that MPA violated the Equal Protection Clause of the Fourteenth Amendment.[1] According to Premier, MPA "intentionally singled out Premier" by refusing to offer it a "commercially fair and reasonable lease." More specifically, Premier challenges as unreasonable two terms which were included in the long-term lease proposals tendered by MPA — the 1,700 vehicle per acre throughput and the forced-relocation provisions. Because Premier is not a member of any suspect class and alleges no burden of any fundamental right, it must prove that it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440-42 (1985); *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 439 (4th Cir. 2002).

Clearly the lease provisions challenged by Premier are rationally related to a legitimate governmental objective. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). The Maryland Port Administration's Organic Act reveals a number of legitimate government purposes. The MPA's primary mission, for example, is to "increase the waterborne commerce of the ports in this State and, by doing so, benefit the people of this State." Md. Ann. Code, Transp. § 6-102(c)(1).

MPA's lease proposals were rationally related to this purpose. MPA could reasonably have concluded that a throughput guarantee was necessary to insure that unproductive tenants did not lock up limited waterfront property and, in this, fail to provide jobs and revenues for Marylanders. As MPA has explained, it "committed every vehicle tenant at the Dundalk Marine Terminal and other facilities to a

---

[1]Premier also argues that MPA engaged in an unconstitutional taking of its private property in violation of the Fifth Amendment. But, like the Fourteenth Amendment, the Fifth Amendment protects property interests, it does not create them. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998). Because Premier advances no constitutionally protected property interest, its Fifth Amendment claim fails as a matter of law.

throughput that makes the most efficient and effective use of our limited terminal land." Similarly, MPA could have concluded that a relocation provision, which gives it the authority to move a tenant to a new location, is a rational way to insure that waterfront property is efficiently allocated.

In any case, Premier's claim that it was "treated differently" from other similarly situated loan applicants who sought leases on the Baltimore waterfront fails on its own terms. First, as the district court found, Premier's competitor Pasha "was willing to enter a long term lease, accepting provisions that are *more favorable* for MPA than those that were rejected by Premier." Second, Premier has not identified any evidence of purposeful discrimination. *See Sunrise Corp. v. City of Myrtle Beach*, 420 F.3d 322, 329 (4th Cir. 2005).

Above and beyond all that, Premier's various constitutional claims are not only tenuous at best, but carry us far afield from the purposes of bankruptcy law in general and Chapter 11 petitions in particular.[2]

---

[2]Premier also alleges various claims under the Shipping Act and requests that this court grant interim injunctive relief pending resolution of its FMC appeal. *See* 46 App. U.S.C. §§ 1709(d)(1), (3), (4), 1710(h)(2). The Shipping Act does permit a plaintiff to file suit in district court seeking "a temporary restraining order or preliminary injunction" when, as here, the plaintiff has a complaint pending before the FMC. *See id.* § 1710(h)(2). The statute sets a high bar for such relief, however. It states that a court may grant injunctive relief only "[u]pon a showing that standards for granting injunctive relief by courts of equity are met." *Id.* As this court has noted, "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

We find no abuse of discretion on the part of the district court in declining to issue to Premier the "extraordinary remedy" of interim injunctive relief. Premier has not made the requisite showing of a significant likelihood of success on the merits. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 814-15, 818 (4th Cir. 1991). Rather, as the district court found, "it is clear" that Premier cannot "demonstrat[e] its entitlement to an injunction." Section 1709(d)(1)'s requirement that a marine terminal operator "establish, observe and enforce just

"The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." *In re Little Creek Dev. Co.*, 779 F.2d at 1073 (quoting *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985)) (alteration omitted). To allow resort to the bankruptcy process for plainly meritless constitutional claims advanced solely to thwart lawful eviction would do nothing but subvert the purposes of a Chapter 11 reorganization.

IV.

It is in the nature of litigation that parties may press claims that turn out ultimately to have no merit. But this case went beyond that. It was at bottom a straightforward contractual dispute between a landlord and tenant and should not have been creatively refashioned as a bankruptcy matter or constitutional controversy brought "for the sole purpose of halting and/or delaying [Premier's] ultimate eviction from the Terminal by MPA." If these sorts of suits are deemed proper subjects for bankruptcy, then those courts (to their own dismay) would be well on their way to becoming courts of general jurisdiction. Both the bankruptcy and district courts refused to permit this, and we affirm the judgment.

*AFFIRMED*

---

and reasonable regulations and practices related to or connected with receiving, handling, storing or delivering property," does not command that MPA have regulations on the specific subject of the leasing of ports facilities. And, for the reasons expressed above, MPA did not "unreasonably refuse to deal or negotiate," *id.* §§ 1709(d)(3), (b)(10), or give any "undue or unreasonable preference" to another party, *id.* § 1709(d)(4). Again, as the district court found, the record reveals "no evidence to undermine the conclusion that, in negotiating with Premier, MPA was acting in a reasonable manner to advance legitimate goals, consistent with its legislated purpose."